UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAGUN TULI, M.D., | JURY DEMANDED |
| | Civil Action No.:  1:07-cv-12338 |
| Plaintiff, | |
| v. | |
| BRIGHAM & WOMEN'S HOSPITAL, INC. | **COMPLAINT** |
| ARTHUR DAY, M.D., | |
| Defendants. | |

## INTRODUCTION

The plaintiff, Dr. Sagun Tuli, M.D., waited for years for Brigham & Women's Hospital

to respond to her complaints of discrimination and disparate treatment at the hands of the Vice

Chairman of the Department of Neurosurgery, Dr. Arthur Day.  Each time Dr. Tuli raised the

issue of disparate treatment of women and minorities, the hospital asked her to be patient while it

worked to fix the work environment.  She was told "these things take time, it will get better."

Rather than address the problem and discipline the Vice Chairman, the hospital made the

incredible decision to promote him to Chairman in the summer of 2007, and then, even more

incredibly, allowed him to retaliate against Dr. Tuli and play a role in the decision on whether to

renew her credentials.  The hospital has informed Dr. Tuli that unless she submits to an

evaluation with a psychiatrist before February 29, 2008, her privileges will not be renewed.

## PARTIES

1.      Plaintiff, Sagun Tuli, M.D. ("Dr. Tuli"), is a Massachusetts resident of Indian descent who is a spine neurosurgeon and a member of the Neurosurgery Department at Brigham & Women's Hospital.

2.      Defendant, Brigham & Women's Hospital, Inc. ("BWH"), is a not-for-profit Massachusetts corporation with a principal place of business at 75 Francis Street, Boston, Massachusetts 02115.

3.      Defendant, Arthur Day, M.D. is a Massachusetts resident who practices at BWH as a vascular neurosurgeon in the Neurosurgery Department ("Neurosurgery Dept.").

## JURISDICTION

4.      This Court has jurisdiction in this case under 28 U.S.C. §1331 as Plaintiff asserts federal claims.

## VENUE

5.      Venue is proper in this Court as all parties are either Massachusetts citizens or a Massachusetts corporation, and the conduct complained of took place in Massachusetts.

## FACTUAL BACKGROUND

6.      Dr. Tuli graduated from the University of Toronto Medical School in 1993 and completed her residency training in neurological surgery at University of Toronto in 2000.  She received a Masters Degree in Epidemiology from the Harvard School of Public Health in 1998, and was a Spine Fellow at Brigham and Women's Hospital (Harvard Medical School) from 2000-2001.  She began practicing at BWH in 2002.  Dr. Tuli was certified in Neurological Surgery by the American Board of Medical Specialties in 2005.  She is an Assistant Professor at

Harvard Medical School, where she has taught since 2002. Dr. Tuli is the first and only female board-certified spine neurosurgeon in the Harvard system.

      7.      In 2003, Dr. Tuli became the Neurosurgery Dept.'s Professionalism Officer and received training on professional conduct in the workplace.

      8.      Two of Dr. Tuli's male colleagues in the Neurosurgery Dept. at BWH from 2002-2004 were also spine surgeons. Dr. Eric Woodard was the Director of Spine, Neurosurgery Dept., when Dr. Tuli was hired.

      9.      When Dr. Tuli began working at BWH, Dr. Peter Black was the Chairman of the Dept. of Neurosurgery, and Dr. Arthur Day was the Vice Chairman. Dr. Day was also the Director of the Residency Program, responsible for the continued medical training of doctors over a seven year period following their graduation from medical school.

## Gender Bias

      10.     Dr. Day, when addressing questions about spine surgery in group settings prior to 2004, would respond to inquires by saying, "Let's ask the spine guys," and exclude Dr. Tuli from the discussion. Dr. Day characterized Dr. Tuli's interest in epidemiology as a "girl's topic."

      11.     In June 2004, at a BWH graduation dinner, Dr. Day turned to Dr. Tuli asked, "Sagun can you get up on the table and dance for us to show the female residents how to behave?"

      12.     In 2004, Drs. Woodard and Eichler left BWH.  As a result, Dr. Tuli became the only spine surgeon in the Neurosurgery Dept. at BWH, and her workload increased significantly.

      13.     After Drs. Woodard and Eichler left BWH, Dr. Day, a vascular neurosurgeon, began appearing at Dr. Tuli's teaching conferences and would question and disagree with her analysis in front of the class, even though Dr. Tuli is more qualified to teach spine-related topics.

When Dr. Tuli commented on the fact that Dr. Day did not challenge the authority or knowledge of her male colleagues, Dr. Day became angry and shouted at her.

14.    Dr. Day has continually made demeaning statements to Dr. Tuli while she was operating, most recently in May of 2007, stating, "You are just a girl, are you sure you can do that?"

15.    Dr. Day refers to female residents by their first name or calls them "girls" in a derisive way, yet refers to male residents as "Dr. Smith" or "Dr. Jones."

16.    The working atmosphere in the Neurosurgery Department became increasingly tense in 2005 because of tension between Dr. Black and Dr. Day.

17.    There were a number of male residents whom Dr. Day favored.  Those residents were referred to as "Art's Boys" by hospital staff.  In 2005, "Art's Boys" did not participate in on-call activities as required, and felt free to ignore Dr. Tuli's pages or to not assist in her in surgeries because they knew Dr. Day would not discipline them for ignoring Dr. Tuli.

18.    Dr. Day interfered with Dr. Tuli's research, which is very important for advancement at teaching hospitals and academic appointments.  Dr. Day told Dr. Tuli he would not give her any time to do research.  Dr. Tuli was also told she would not be allowed to do research on spine oncology because Dr. Day said, "I have a guy I want doing this."

19.    When Dr. Day interviewed a male spine neurosurgeon in 2007, he told the surgeon he would have a dedicated research day if he joined the BWH Neurosurgery Department.

**First Internal Complaint**

20.    In July 2005, Dr. Tuli met with the Chief Medical Officer at BWH, Dr. Anthony Whittemore.  During that meeting, Dr. Tuli complained about Dr. Day's treatment of her and

other minorities and women.  She also told Dr. Whittemore about Dr. Day's comment that she should have danced on a table to show the female residents how to act.

21.    Dr. Whittemore said he would look into the situation.  Dr. Black ultimately asked Dr. Day to discuss Dr. Tuli's concerns with her.  Dr. Day refused to attend a meeting with her and Dr. Black.

22.    In September, 2005, Dr. Tuli, along with the rest of the Neurosurgery faculty, was interviewed by an employee in the Human Resources department.  Dr. Tuli was assured that HR was not investigating any formal complaint against Dr. Tuli, but instead was evaluating communications within the Neurosurgery Dept.  Upon information and belief, the investigation was prompted by increasing tensions in the department that resulted from a power struggle between Dr. Black and Dr. Day.

23.    Dr. Tuli repeated the same comments about disparate treatment of women that she had made to Dr. Whittemore to the HR representative, and also stated that Dr. Day refused to work with two female vascular residents of Indian descent, Dr. Stephanie Green and Dr. Malani Narayanan.

24.    In the fall of 2005, Dr. Tuli, in light of the training she received as the Department's professionalism officer, decided that she would make an effort to re-open the lines of communication with Dr. Day.  Dr. Tuli approached Dr. Day about making amends, and they spoke at length.

25.    Dr. Day said that he and Dr. Tuli were like lovers, and that she had "cheated" on him by not listening to him and by "going after him" during rounds.

26.    After the HR investigation was completed, Dr. Tuli met with Dr. Gary Gottlieb, the President of BWH.  Dr. Gottlieb told her, "no one in your department gets along with each other – but one thing everyone agrees on is that you are an exceptional surgeon."

27.    Dr. Day subsequently made statements that the HR investigation took place because of Dr. Tuli, and others in the Department blamed her for the investigation.  In December 2005, BWH told Dr. Tuli that "changes are being made," but they were not yet public.  After waiting another month for her concerns to be addressed, Dr. Tuli again complained about the environment to Dr. Black, who said he would report her complaints to Human Resources.  BWH took no action on Dr. Tuli's complaints of disparate treatment and discrimination on the part of Dr. Day in 2005 or through early 2006.

28.    In 2005, a female resident of Indian descent, Dr. Malani Narayanan, was fired five months before she would have completed her residency in the Neurosurgery Dept. at BWH.  Dr. Narayanan filed a complaint alleging discrimination at the Massachusetts Commission Against Discrimination ("MCAD").  Dr. Narayanan named Dr. Day as a defendant in her MCAD complaint.

29.    After the Narayanan complaint was filed, it was discussed at a meeting of the BWH neurosurgeons.  One doctor suggested that Dr. Narayanan be rehired so that she could complete her residency.  Dr. Day did not agree with this recommendation.  One surgeon asked, "Is there anyone here would let this woman [Dr. Narayanan] take care of their patients?"  Dr. Tuli raised her hand and said "I would."

30.    Dr. Day has retaliated against Dr. Tuli for her support of Dr. Narayanan.

31.    Dr. Day made Dr. Tuli's operating schedule much more challenging.  Because her surgery schedule is so full, she often has to operate on Thursdays, a day on which other

neurosurgeons rarely operated.  Dr. Day, however, instructed the attending physicians in the Neurosurgery Dept. that the residents would not assist in operations on Thursdays, which meant that Dr. Tuli had to operate without the assistance of another doctor.

32.     In 2006, Dr. Tuli informed Dr. Black that she was exhausted by the responsibility of covering the spine call every other week and still being required to cover the general neurosurgery call.  Dr. Black raised the issue at a department meeting and suggested that relieving Dr. Tuli of the general spine neurosurgery call once every five weeks would help lessen the  burden she bore as the only spine neurosurgeon to cover spine call.  Dr. Day said "absolutely not."

33.     In early 2006, there were two Chief Residents in the BWH Neurosurgery Dept. – one male and one female.  Dr. Deepa Soni voiced her displeasure that Dr. Day was not providing her with the same learning opportunities as the male Chief Resident.  Dr. Soni contended that the male resident participated in a higher number of surgeries, was able to perform more complex procedures, and was given more flexibility in scheduling on-call time and arranging for someone else to cover for him, which allowed him to attend important conferences that are crucial for residents who seek employment with top level hospitals.

34.     In 2006, Dr. Deepa Soni filed a complaint with the MCAD and named Dr. Day as a defendant.

<u>**Second Internal Complaint**</u>

35.     Dr. Tuli again brought issues of gender equity to the attention of Dr. Whittemore, the Chief Medical Officer and Dr. Gary Gottlieb, President of BWH, in April 2006.  Dr. Tuli again asked BWH to take action to address her concerns about the unprofessional and retaliatory nature of Dr. Day's dealings with her and other women.  She informed BWH that Dr. Day

frequently loses his temper, swears, yells at residents, staff and nurses, and at times grabbed them or pushed them when he lost his temper.

36.    On multiple occasions, Dr. Day has yelled at Dr. Tuli, and he once told her after a meeting that he wanted to cut her legs off.

37.    Dr. Day touches female employees in a way that is inappropriate in the workplace. He has put his arm around Dr. Tuli in the operating room, has stroked the arms and backs of nurses, and hugged women when there was no personal or professional reason for physical contact.  Dr. Day does not hug or stroke male BWH employees.

38.    Dr. Tuli also reported that she had been subjected to propositions and sexual innuendo by one of the male attending physicians, which had started during her 2005 Board exams.

39.    In an April 2006 letter to Dr. Whittemore, Dr. Tuli relayed her concern that Dr. Day was not only harming her reputation within BWH, but that he was making disparaging comments about her beyond BWH.  Dr. Tuli gave Dr. Whittemore an example that a colleague had shared with her.  The colleague spoke with a doctor who practices at another hospital, and Dr. Tuli's name came up in the conversation.  The doctor said, "that Tuli woman?  I hear she's lazy and is costing the hospital a lot of money."

40.    In response to her letter, Dr. Whittemore met with Dr. Tuli and told her that he thought she should find a new environment to work in, saying, "We have taken care of the two other women [Drs. Narayanan and Soni] – we can take care of you, too."  When Dr. Tuli noted that nothing in the department had changed, Dr. Whittemore told her that change takes time and it was "like turning a ship in the ocean," which could take two years.

41.    Dr. Tuli retained counsel in mid 2006 and agreed to give BWH more time to address her concerns.  Subsequently, BWH agreed to compensate Dr. Tuli for the extra spine call coverage, which Dr. Tuli took as an indication that the Hospital was finally going to address all the concerns she had raised.  But again, BWH did nothing to address her complaints that women and minorities were treated as second-class citizens.

42.    By July 2006, Dr. Black stepped down as the Chairman of the Neurosurgery Department and Dr. Whittemore became the Acting Department Chair.  Dr. Day was emboldened by the fact that Dr. Black was no longer the Chairman, and his retaliation and hostility toward Dr. Tuli escalated.

### Dr. Tuli Is Labeled "Difficult" For Exercising Independent Judgment in the Best Interest of the Patient

43.    Dr. Tuli frequently spends 10-15 hours a day in the operating room.  She continues to carry a caseload that is substantially heavier than any of her colleagues because she is still the sole spine neurosurgeon at BWH.  In her weekly clinic, she sees up to 40 patients per day.  Dr. Tuli has adapted to the pressure of her practice by trying to be extremely efficient with her time and by focusing intently on patients during surgery.

44.    When Dr. Tuli is operating, she does not allow music to be played, she does not allow talking or chit-chat among nurses or scrub techs, she does not leave the room or try to conduct two operations in adjoining operating rooms, and she does not return to her office after the surgery is complete, but instead stays in the operating room to get it ready for the next operation.  Dr. Tuli's operating room is very efficient.  Of all the surgeons at BWH, Dr. Tuli has the fastest turn around-time in the operating room.

45.    While operating, Dr. Tuli's primary concern is the patient's well-being.  While operating, Dr. Tuli will instruct staff and other physicians as necessary.  For example, Dr. Tuli

once noticed that an anesthesiologist was checking his stocks on-line during the surgery. Dr. Tuli did not yell or scream. She simply told the anesthesiologist, "I would appreciate it if you would not monitor your stocks on the computer and please pay attention to the patient." The operation continued, and the patient recovered. At the end of the surgery, the anesthesiologist shouted at Dr. Tuli about her comment and complained about her to the Director of the Operating Room.

46.    On one occasion, when Dr. Tuli had several surgeries scheduled on a Thursday and there were no residents available to assist her, per Dr. Day's edict, a resident called into the operating room to ask her opinion on a patient with three thoracic herniated discs who had lost feeling in his legs. Dr. Tuli instructed the resident to find the patient's attending physician and get another neurosurgeon to operate on him or transfer the patient out of the hospital. Dr. Day then instructed the resident to tell Dr. Tuli to open up another operating room and do two cases at once. This was impossible as Dr. Tuli was already operating on a challenging case and had no residents to assist her. Eight hours later, while Dr. Tuli was still in the operating room, she checked back with the resident, who informed her that no one else would operate on the patient. Dr. Black called into the operating room and told Dr. Tuli that if she didn't do the operation, the other doctors would say she was "difficult."

47.    At times, other doctors have scheduled patients for elective surgery with Dr. Tuli without discussing the case with her or seeking her input. On a few of these occasions, after Dr. Tuli asked to see the patient chart and discussed the surgery with the patient, she did not advise the patient to go through with the surgery. On one occasion when she told Dr. Day that she did not think surgery was indicated, he asked "What's the matter, are you afraid you can't handle it because you're a girl?"

48.    In late August of 2007, Dr. Tuli started on a relatively short operation and asked a nurse for a dressing.  The nurse said she was busy administering medication.  When Dr. Tuli again asked for the dressing when the nurse was not administering medication, the nurse did not respond.  Dr. Tuli did not yell or scream.  Instead, she asked for the nurse to be replaced during the rest of the operation, which was completed without incident.  The patient recovered.  Dr. Tuli subsequently apologized to the nurse for any embarrassment and explained that given how fast the operation was progressing, she expected all operating room staff to be able to keep up with the pace and the patient's needs.  The nurse complained about Dr. Tuli's decision to remove her from the surgery.

49.    Male doctors at BWH who advocate on behalf of patients and stand by their clinical decisions are not characterized as "difficult."

### Third Internal Complaint

50.    In March 2007, Dr. Tuli met with Dr. Whittemore and he asked how she was doing. She told him that she still faced a very challenging work environment and that Dr. Day continued to demean her in front of the other doctors now that Dr. Black was no longer there to act as a somewhat moderating influence.  She again asked Dr. Whittemore to take some action in response to her complaints and concerns.

51.    Dr. Whittemore ultimately recommended that Dr. Day be promoted to Chair of the Neurosurgery Department.   Dr. Day was emboldened by the fact that no action had been taken against him as the result of Dr. Tuli's complaints, and believed that his promotion signaled that BWH would not prevent him from retaliating against her.

52.    At the time of his promotion in the summer of 2007, there were two MCAD complaints filed against Dr. Day, as well as Dr. Tuli's internal complaints.

53.     When Dr. Tuli again asked to be promoted to the "Director of Spine" position in the summer of 2007, Dr. Day said, "I want my guy" to be the head of spine.  He also told Dr. Tuli, "I want you to continue to be a slave for the department and be on call every other week, and continue to take care of the whole spine service for the department."  At a faculty meeting in September 2007, Dr. Day said that Dr. Tuli "is going to step up to the plate and do all the spine call."

**Retaliation**

54.     In September 2007, BWH received a copy of Dr. Soni's rebuttal to BWH's Position Statement submitted to the MCAD.  Dr. Day, upon information and belief, received a copy of the rebuttal.

55.     Unknown to Dr. Tuli, Dr. Soni's Rebuttal Statement stated "Dr. Soni also publicly supported an Indian female attending neurosurgeon, Dr. Sagun Tuli, in her claims of race and gender discrimination against BWH."

56.     BWH reviews the privileges granted to physicians every two years.  Dr. Tuli was due to be reviewed in October 2007.

57.     On October 1, 2007, Dr. Whittemore told Dr. Tuli that because of all of her patient complaints, he was going to renew her privileges only until February, so that "we can sort this out."

58.     Dr. Tuli contacted the Director of Patient Relations to inquire about patients' complaints.  The Director of Patient Relations said that there were eight complaints over two years, which could be broken down into four categories: 1) patients asking for surgery where Dr. Tuli did not think surgery was indicated; 2) patients who were unhappy that Dr. Tuli did not complete disability applications because she did not think the patients were disabled; 3) patients

who were unhappy with the conduct of other BWH employees, not Dr. Tuli; and 4) patients were not satisfied, although Dr. Tuli had taken action in response to their requests.

59.     The Director of Patient Relations did not have any concerns about Dr. Tuli's competence or patient interactions as the result of the complaints.  Over the two-year period of 2006-2007, Dr. Tuli saw more than 2000 patients.

60.     Dr. Tuli was scheduled to be presented to the Medical Staff Credentials Committee (the "Credentials Committee") on October 9, 2007.  At her previous reviews by the Credentials Committee, Dr. Tuli was "presented" by another neurosurgeon, Dr. Frerichs, who typically presents all neurosurgeons.

61.     Dr. Frerichs did not present Dr. Tuli to the Credentials Committee on October 9, 2007 – Dr. Day did.  Dr. Day's input drove the peer review process and the Committee's ultimate result and recommendation, was based in large part on his status as Chairman.

62.     When Dr. Tuli returned from vacation in mid-October, she was given the name and number of a psychiatrist.  When she asked Dr. Whittemore why she was given that information, he told her that her privileges would expire in four months unless she agreed to be evaluated by a psychiatrist employed by Physicians Health Service and comply with whatever treatment or recommendations was suggested.

63.     BWH subsequently informed Dr. Tuli that "due to concerns about issues of interpersonal communication and behavior (including interactions with members of the medical staff, other hospital employees and patients)" her privileges will expire on February 29, 2008, unless she submits to an evaluation by Physicians Health Service and complies with whatever recommendation is made by Dr. Luis Sanchez.  Dr. Tuli was also informed that her privileges were approved at a "Category 2" level.

64.    BWH doctors who are classified as "Category 2" have their privileges evaluated every four months.

65.    Dr. Tuli asked if there were any formal complaints against her by BWH employees. Dr. Whittemore responded "there are no written complaints yet, but there could be in the future."

### Retaliation for Reporting Patient Complications

66.    Dr. Tuli has been the Neurosurgery Dept.'s representative to the BWH Quality Assurance Committee ("QA Committee") since early 2004.  BWH, and all hospitals, are required to have a system whereby doctors review patient care and report patient complications to a centralized committee, which then makes a determination of whether any of the internally-reported cases must be reported to the Commonwealth's Board of Registration in Medicine.

67.    In June 2005, Dr. Tuli met with Dr. Day to inquire about a patient of his who had a complication after surgery.  Dr. Tuli had reviewed the patient's chart before meeting with Dr. Day in her capacity as the Dept.'s representative to the QA Committee.

68.    Dr. Day told Dr. Tuli to tell the QA Committee that the patient had been doing poorly neurologically.  Dr. Tuli said she would not tell the committee that the patient had been doing poorly because the patient's chart indicated otherwise.

69.    Dr. Tuli reported the patient complication to the BWH Medical Staff Quality Assurance Committee and accurately described the information in the patient's chart.   Dr. Day was angry at Dr. Tuli because of her refusal to communicate what he wanted her to say to the QA Committee.

70.    In February 2006, Dr. Day told other BWH physicians that one of his patient complications had been reported to the Board of Registration "because of Dr. Tuli" whom he described as "whistleblower."  Dr. Tuli, however, did not vote on the case and was not involved

in the decision to present it to the Quality Assurance Committee, much less BWH's decision to report the case to the Board.

71.    In April 2006, Dr. Tuli informed the Chief Medical Officer, Dr. Whittemore, of her concern that Dr. Day was retaliating against her because of her responsibility as the QA representative for the Neurosurgery Dept., and the fact that she repeatedly instructed residents that they were required to report all patient complications.

72.    Over the summer of 2006, a patient with a serious spinal injury was treated with a brace.  When the patient sat up, he tipped forward, and the resident on call asked for Dr. Tuli's help given the risk of paralysis.  Dr. Tuli operated on the patient, who recovered with no paralysis.  During rounds, one of the teaching tools for residents during which the attending physicians discuss their cases, Dr. Tuli conveyed concern about the decision to put that patient in a brace because this type of fracture if, managed conservatively, can cause paralysis.  Dr. Day, who had made the decision to put the patient in the brace, defended his decision, while Dr. Tuli continued to express her opinion that, based on the literature, the brace was not the most appropriate treatment.

73.    After rounds, Dr. Day complained that Dr. Tuli had "gone after him" and that she should not have criticized his decision in front of the residents.  In September 2005, Dr. Day told Dr. Tuli she should step down from the QA Committee because all the other doctors thought she was going to "go after them."  He made a similar comment in 2006.

74.    In November 2006, Dr. Tuli reported to Dr. Whittemore that the residents were not reporting Dr. Day's complications.  The residents were not comfortable reporting on Dr. Day's complications because he was in charge of the residency program.  Upon information and belief,

there were private meetings at BWH to discuss Dr. Day's complications, a practice that did not conform with BWH or the Neurosurgery Department's standard procedures.

75.    In July 2007, a BWH patient required a craniotomy.  After a section of the patient's skull was removed, the surgeon realized that she was operating on the wrong side of the skull.  She then performed a craniotomy on the other side of the patient's skull.  The patient ultimately died.  Dr. Day told the residents to never speak of the error again.  This complication was not reported at the Neurosurgery Dept. rounds.  If it was reported to the QA Committee, Dr. Tuli, the Neurosurgery Dept. representative, was not  informed of it.

76.    Surgery on the wrong part of the body, especially in combination with a patient death, is the type of complication that gets reported to the Board of Registration and that can prompt an investigation.  Rhode Island Hospital was fined $50,000 in November 2007 and reprimanded by the Rhode Island Department of Health after a similar incident.

### More Work, Less Pay

77.    From 2004 to the present date, Dr. Tuli has been on spine call every other week, (for a continuous week), in addition to being on the general neurosurgery call once every five weeks.  Her colleagues in the department typically cover the general neurosurgery call once every five weeks.  When Dr. Tuli is on spine call in any given week, she is called by other doctors at all hours of the day and night and reports to the hospital to evaluate or operate on patients if necessary.

78.    As the result of her increased workload, Dr. Tuli generated the highest revenue of any surgeon in the Neurosurgery Dept. in 2005, yet she was paid less than male doctors who worked less and generated less revenue.

79.    Dr. Tuli informed Dr. Whittemore in 2005 that she was working an incredibly demanding schedule while maintaining excellent patient results and generating the highest revenue of any other surgeon in her department, but that she was underpaid and subjected to Dr. Day's hostility and an unprofessional work environment.  She also noted that one of her male colleagues, who had not practiced as long as she had and who had fewer credentials, was named a Division Head, while her request to be promoted to the Director of Spine had been ignored.

80.    At BWH, each neurosurgeon is paid a base salary, and is entitled to a bonus based on the profits earned within the Department.  Each surgeon's revenue collection is used as a measure to allocate how the profits will be distributed as a bonus.

81.    Dr. Tuli performs many more operations than most other neurosurgeons in the Dept.  Yet Dr. Tuli also works considerably more than other neurosurgeons because she is on call every other week instead of once every five weeks.  While she is on call, she responds to pages at all hours of the day and night, and goes to the hospital to examine patients when necessary.  Much less revenue is generated for a simple patient consult than for an operation.  Accordingly, Dr. Tuli works longer hours and sees more patients than her male counterparts, but she is compensated less because her "on call" hours do not always result in revenue-generating operations.

82.    BWH did not change Dr. Tuli's compensation structure to reflect the fact that she was on call every other week until 2006, when she retained counsel.  In October 2006, BWH increased Dr. Tuli's base salary to reflect her additional workload.  That increase, however, was equal to the amount that Dr. Tuli was already entitled to as a bonus.  BWH also paid Dr. Tuli an additional flat fee to compensate her for the increased on call responsibility she had to bear in 2005-2006.

83.    Dr. Tuli still bears the burden of being on spine call every other week.  Even when she is not on call, she is typically contacted by residents because she is responsive and able to advise them.  Dr. Tuli works longer and harder than her male counterparts, but BWH pays her less.  BWH has not compensated Dr. Tuli in 2007 for the increased on-call work that she does.

84.    Dr. Tuli has complied with the requirement set forth in Chapter 151B and Title VII that she first file a Complaint alleging discrimination and retaliation with the Massachusetts Commission Against Discrimination.

## COUNT ONE
### Discrimination – Title VII and Mass. Gen. Laws ch. 151B
### Against All Defendants

85.    Dr. Tuli repeats and realleges paragraphs 1-84 as if set forth fully herein.

86.    BWH is one of Dr. Tuli's employers and is subject to the anti-discrimination law.

87.    BWH's actions and inactions with regard to Dr. Tuli's complaints of disparate treatment and unequal pay on the basis of her color, gender and national origin violate Title VII of the Civil Rights Act, 42 USC §2000e et. seq, and Mass. Gen. Laws ch. 151B, § 4(1).

88.    Dr. Day's conduct constitutes aiding and abetting discrimination on the basis of Dr. Tuli's color, gender and national origin for which he is subject to personal liability.

89.    The Defendants' statutory violations have caused and continue to cause Dr. Tuli to suffer damages.

## COUNT TWO
### Retaliation – Title VII and Mass. Gen. Laws ch. 151B
### Against All Defendants

90.    Dr. Tuli repeats and realleges paragraphs 1 – 89 as if set forth fully herein.

91.    BWH's actions as alleged above constitute unlawful retaliation against Dr. Tuli for asserting her rights, and the rights of others, under 42 USC §2000e-3 and MGL ch. 151B, § 4(4).

92.    Dr. Day's actions as alleged above constitute unlawful retaliation against Dr. Tuli for asserting her rights, and the rights of others, under 42 USC §2000e-3 and MGL ch. 151B, § 4(4).

93.    The Defendants' statutory violations have caused and continue to cause Dr. Tuli to suffer damages.

## COUNT THREE
### Unequal Pay
### Against BWH

94.    Dr. Tuli repeats and realleges paragraphs 1 – 93 as if set forth fully herein.

95.    BWH has discriminated against Dr. Tuli on the basis of her gender by paying her less than her male colleagues though she covers the Neurosurgeries spine call much more than any other surgeon and has not been compensated for her additional work since 2006.

96.    BWH has violated the Equal Pay Act under 29 USC §§ 201-219 and MGL ch. 149, §105A.

97.    Dr. Tuli has suffered and will continue to suffer damages as the result of BWH's statutory violations.

## COUNT FOUR
### Health Care Whistleblower Act – Mass. Gen. Laws ch. 149, §187(b)
### Against All Defendants

98.    Dr. Tuli repeats, realleges, and incorporates paragraphs 1 – 97 as if set forth fully herein.

99.    BWH is a health care facility as defined in c. 149, §187(a).

100.    Dr. Tuli is a health care provider as defined in c. 149, §187(a).

101.    Dr. Tuli informed BWH that Dr. Day's complications were not reported by residents, contrary to the Department's procedures.

102.  Dr. Day has taken retaliatory action against Dr. Tuli because of her performance of her obligations as the Neurosurgery Dept.'s representative to the QA Committee and because she objected to the practice of residents not reporting his complications.

103.  Dr. Day has aided and abetted unlawful retaliatory action against Dr. Tuli in violation of the Health Care Whistleblower Act and is subject to personal liability.

104.  BWH has engaged in retaliatory action against Dr. Tuli in violation of the Health Care Whistleblower Act by putting her privileges at risk based on the input of Dr. Day.

105.  Defendants' unlawful conduct has caused and will continue to cause Dr. Tuli to suffer damages.

## COUNT FIVE
### Intentional Interference with Advantageous Relations
### Against Dr. Day

106.  Dr. Tuli repeats and realleges paragraphs 1 – 105 as if set forth fully herein.

107.  Dr. Day was aware of Dr. Tuli's employment relationship with BWH and intentionally interfered with that relationship for an improper purpose or by improper means, including but not limited to his presenting Dr. Tuli for peer review in bad faith and with malice.

108.  Dr. Day's malice and bad faith void the conditional privilege applicable to supervisors in an employment relationship, and void the privilege afforded to peer review communications, as provided for in Mass. Gen. Laws ch. 231, § 85N.

109.  Dr. Day's conduct has caused and continues to cause Dr. Tuli to suffer damages.

## COUNT SIX
### Slander
### Against Dr. Day

110.   Dr. Tuli repeats and realleges paragraphs 1 –109 as if set forth fully herein.

111.   Dr. Day made false statements concerning Dr. Tuli to third persons and those statements damaged Dr. Tuli's reputation in the community and prejudiced Dr. Tuli's professional reputation.

112.   Dr. Day's conduct has caused and will continue to cause Dr. Tuli to suffer damages.

WHEREFORE, Dr. Sagun Tuli respectfully requests that this Court:

(a)    Enjoin the Defendants from taking any action with regard to Dr. Tuli's privileges based on the peer review process that took place in October 2007 until such time as there is a final judgment in this action;

(b)    Enter judgment in her favor on Counts I-III, including an award of damages to be determined at trial, including an award of treble damages, costs, and attorney's fees;

(c)    Enter judgment in her favor on Count IV in an amount to be proven at trial and award Dr. Tuli her reasonable costs and fees and enjoin the Defendants from further violations of the Health Care Whistleblower Act ;

(d)    Enter judgment in her favor under Counts V-VI and award damages in an amount to be proven at trial; and

(e)    Award such other and further relief as the Court deems appropriate.

**THE PLAINTIFF DEMANDS A JURY TRIAL
ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted,

Sagun Tuli, M.D.,
By her attorneys,

__/s/ Margaret M. Pinkham
Margaret M. Pinkham (BBO #561920)
mpinkham@brownrudnick.com
Rachel A. Lipton (BBO #664402)
rlipton@brownrudnick.com
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
(617) 856-8265

Dated: December 19, 2007

# 1533340 v2 - pinkhamm - 027218/0001