# United States District Court
# District of Massachusetts

SAGUN TULI, M.D.,
     Plaintiff,

     v.                               CIVIL ACTION NO. 07-12338-NG

BRIGHAM & WOMEN'S HOSPITAL, INC.,
ARTHUR DAY, M.D.,
     Defendants.

## REPORT AND RECOMMENDATION
## ON PLAINTIFF, SAGUN TULI, M.D.'S,
## MOTION FOR PRELIMINARY RELIEF (#32)

COLLINGS, U.S.M.J.

### I. Introduction

On December 20, 2007, plaintiff Sagun Tuli, M.D. (hereinafter "Dr. Tuli") filed a five-count complaint (#1) naming as parties defendant Brigham & Women's Hospital, Inc. (hereinafter "BWH") and Arthur Day, M.D. (hereinafter "Dr. Day").  Dr. Tuli, a woman of Indian descent, is a spine neurosurgeon and a member of the Neurosurgery Department at BWH.  Dr. Day is a vascular

neurosurgeon and Chairman of the Department of Neurosurgery at BWH.  The plaintiff alleges that she has suffered disparate treatment and received unequal pay on the basis of her color, gender and national origin in violation of state and federal law (Count One); that she has suffered retaliation in violation of state and federal law as a result of asserting her rights under anti-discrimination laws (Count Two); that BWH has violated the Equal Pay Act under state and federal law (Count Three); that she has been subjected to retaliatory action in violation of the state Health Care Whistleblower Act (Count Four); and that Dr. Day has interfered with her advantageous employment relationship with BWH (Count Five).  On January 10, 2008, BWH and Dr. Day each filed answers (##11, 12) to Dr. Tuli's complaint and then on January 30, 2008, both submitted amended answers (##16, 17).

On March 21, 2008, Dr. Tuli filed a motion for preliminary injunctive relief (#32) by which she seeks to prevent BWH from requiring her (a) to report to Physician Health Services (hereinafter "PHS") for an evaluation and (b) to follow PHS' recommendations, if any, in order to maintain her privileges at the hospital.[1]  In addition to the motion, a memorandum in support (#33) as well

---

[1]
    The District Judge to whom this case is assigned has referred the motion for preliminary judgment to the undersigned for the issuance of a report and recommendation with respect to disposition pursuant to

as seven affidavits (##35-41), some with exhibits attached, were submitted.

Approximately two weeks later, the defendants filed an opposition (#49) to the

preliminary judgment motion which included fifty-six appended exhibits. With

leave of Court, the plaintiff filed a reply brief with exhibits (#53) and the

defendants submitted a sur-reply with exhibits (#56). Lastly, Dr. Tuli has filed

a brief with supplemental authority and a supplemental affidavit (##58, 59).[2]

The need for an evidentiary hearing was eschewed by the parties (*see* Electronic

Notice Of Rescheduling dated 04/03/2008), but oral argument was heard on

April 9, 2008 and, at this juncture, the motion for preliminary injunction is

poised for resolution.

## *II. The Facts*

### A.  Dr. Tuli and Dr. Day are Hired and Begin Work at BWH

In March of 2002, Peter M. Black, M.D. (hereinafter "Dr. Black"), then

Chief of the Neurosurgery Department at BWH, offered Dr. Tuli a position on

the staff of BWH and Harvard Medical School starting on or about July 1, 2002.

---

28 U.S.C. §636(b).  The parties have agreed to shorten the time within which  any objections to this report and recommendation must be filed from ten days to seven days. (Joint Statement of Counsel #44)  Further, the defendants have stipulated that Dr. Tuli's privileges to practice at BWH shall be extended to May 15, 2008, in order to afford the Court adequate time within which to rule on the plaintiff's motion. (#44)

[2]

At the April 17th hearing, the plaintiff was granted leave to file  the Declaration of Paul B. Hofmann, Dr.P.H., FACHE (#61), an expert witness.

(#49, Exh. B)  Under the terms of the offer, the plaintiff was to be hired as an

Instructor in Surgery at the Harvard Medical School and as an Associate

Surgeon at BWH. (#49, Exh. B)  Her salary for a two-year period was to be

$180,000 per annum; subsequent to June 30, 2004, her salary was to be

determined in accordance with the incentive and productivity standards

established by the Department of Neurosurgery. (#49, Exh. B)  Dr. Tuli

accepted the offer. (#1 ¶6; #16 ¶6; Affidavit of Sagun Tuli, M.D. #36 ¶2)

According to Anthony Whittemore, M.D., the Chief Medical Officer ("CMO") of

BWH (hereinafter "Dr. Whittemore"), upon being hired all BWH physicians,

including Dr. Tuli, execute a contract which contains the following provision:

> If requested, I agree to undergo a mental or physical
> examination, prior to or during the term of my
> appointment to determine whether I am able to
> perform the essential functions of the position for
> which I have applied or for the privileges which I have
> requested, with or without a reasonable
> accommodation, according to accepted standards of
> professional performance and without posing a threat
> to patients or staff.

Defendants' Surreply, #56, Exh. CCC, Supplemental Affidavit of Anthony
Whittemore, M.D. ¶9.

Dr. Day was also hired by BWH in 2002, in July of that year assuming the

titles and duties of Residency Director and Vice Chairman of the Department of

Neurosurgery. (#36 ¶4; #49, Exh. D, Affidavit of Arthur L. Day, M.D. ¶4) Before he joined the staff at BWH, Dr. Day had been employed for four years as the Co-Chairman and Program Director of the Neurosurgery Department at the University of Florida, and had practiced at that university for approximately twenty years. (#36 ¶4; #49, Exh. D ¶5) Dr. Day had held numerous leadership positions in several national neurological surgery groups and associations and enjoyed national renown in that field. (#36 ¶4; #49, Exh. D ¶5)

From the time Dr. Tuli began working in the Neurosurgery Department at BWH until July, 2006, Dr. Black served as Chairman of the Department. (#49, Exh. C, Affidavit of Anthony Whittemore, M.D. ¶5; Exh. D ¶6) During that period of time, Dr. Day "had no authority to hire, fire, promote or demote any of the medical professional staff"; "had no role relative to the compensation any member of the Department was paid"; and "had no authority with regard to the setting of the call schedule for the Department." (#49, Exh. C ¶5; Exh. D ¶6)

In 2003, Dr. Black appointed Dr. Tuli as the Professionalism Officer for the Department of Neurosurgery. (#36 ¶7; #49, Exh. C ¶6) In that role it was the plaintiff's responsibility "to promote and support a diverse, appropriate and professional atmosphere" in the workplace. (#36 ¶7)

5

Dr. Tuli was notified in November, 2003, that her privileges at BWH had been renewed. (#36 ¶9)

B.  Dr. Tuli and the QARM Committee

In 2002, at Dr. Black's request, Dr. Tuli became the representative of the Neurosurgery Department to the BWH Quality Assurance and Risk Management ("QARM") Committee. (#36 ¶6; #49, Exh. C ¶6)  In that capacity, the plaintiff was tasked with providing the Neurosurgery Department's Morbidity and Mortality lists, i.e., lists of patient complications, to the QARM Committee. (#36 ¶6)

In 2003 or 2004 Janet Barnes of the Risk Management department, Dr. Tuli and another doctor had a discussion about "the lack of information of complications that we were seeing coming out of the neurosurgery department." (#35, Exh. B at 41)  In mid-2004, the QARM committee asked Dr. Tuli to investigate a case which the committee ultimately voted to report to the Board of Registration of Medicine as a major incident report. (#35, Exh. B at 50-51; 59)  It was Dr. Day's case and he "was upset about the decision to report the case to the board." (#35, Exh. B at 52-53)  Dr. Day believed that he was being reported to the board by Dr. Tuli and was upset about it. (#35, Exh. B at 57) Although Janet Barnes tried to explain to Dr. Day that he was incorrect, rather

6

"that the hospital had an obligation to report certain types of cases and that Dr. Tuli was doing her job as a member of the quality assurance risk management committee", she was not sure that Dr. Day understood. (#35, Exh. B at 57-58) "The thought crossed [Ms. Barnes'] mind" that Dr. Day would hold the report against Dr. Tuli. (#35, Exh. B at 72) Janet Barnes never had a conversation with Dr. Tuli during which the plaintiff "expressed concern that Dr. Day was holding her performance as the QARM rep for the Neurosurgery Department against her." (#35, Exh. B at 73)

In June, 2005, Dr. Day is alleged to have become angry at the plaintiff when she would not present another of his cases to the QARM Committee in the manner he wanted it presented. (#36 ¶19)[3]

C.  Dr. Tuli's Requests for Promotion, Promotions and Compensation

After two of her colleagues left BWH in late August/early September, 2004, Dr. Tuli was the sole remaining spine surgeon in the Neurosurgery Department. (#36 ¶10) As a consequence, the plaintiff's workload surged, most notably with regard to her on-call duties. (#36 ¶¶11-13) At that time, Dr. Tuli

---

[3]

     There was an incident in June, 2007, in which Dr. Tuli complained about a medical event by one of Dr. Day's clinical fellows which was not reported to the QARM Committee. This is discussed at pp. 23-24, *infra.*

asked Dr. Black to name her Director of Spine, and he said that he would consider the request if she proved her worth to the Department. (#36 ¶13) Dr. Tuli became Board Certified in Neurosurgery in 2005, and that same year Dr. Black promoted her to Assistant Professor. (#36 ¶20; #49, Exh. C ¶6)

In 2005 Dr. Tuli repeated her request that she be named Director of Spine as her male colleagues had been given such titles when senior doctors on their services left BWH. (#36 ¶25) That designation was not forthcoming. (#36 ¶25) In October, 2005, Dr. Tuli asked Dr. Black to promote her. (#36 ¶ 43) Later requests for promotion and complaints in 2006 and 2007 about not being promoted are detailed, *infra*.

Dr. Tuli received a $100,000 raise in her base salary from $180,000 to $280,000 for fiscal year 2005. (#49, Exh. I, Affidavit of Jeffrey J. Pike ¶5) She also received a retroactive payment of $120,000 to compensate her for the extra on-call duties she carried in 2005-2006[4] and an additional clinical bonus of $128,353 for 2006. (#49, Exh. I ¶6) In total, Dr. Tuli received $528,603 in compensation from BWH in calendar year 2006. In fiscal year 2007, the

---

[4]

Kai Frerichs, M.D. (hereinafter "Dr. Frerichs"), avers that on two separate occasions, one period lasting more than six months and another lasting for more than a year, he had to carry a greatly increased on-call load when colleagues left BWH and he was the only remaining Interventional Neuroradiologist. (#49, Exh. V, Affidavit of Kai Frerichs, M.D. ¶5) Dr. Frerichs did not request or receive additional compensation for the additional on-call duties. (#49, Exh. V ¶6)

plaintiff's base salary was $400,000 reflecting a $120,000 raise; that "was the highest base salary in the Department of Neurosurgery among all Assistant Professors with her years of experience." (#49, Exh. I ¶¶8-10)

### D.  Dr. Tuli and Dr. Day

#### 1.  2004-2005

The plaintiff contends that since Dr. Day has been employed at BWH, he has, among other things, excluded or ignored her during professional discussions at staff meetings, referred to her and other women as "girls", addressed female physicians by their first names but male doctors by their titles, and challenged her knowledge or authority but not that of male doctors. (Affidavit of Margaret M. Pinkham, Esq. #35, Exh. A; #36 ¶¶8, 14, 15; Affidavit of Kari E. Peterson #38 ¶2 ("Based on four comments reported to me by various people, I was concerned that Dr. Day could develop an unflattering reputation for sexism and making inappropriate sexual comments regarding women."); Affidavit of Robin Beal #39 ¶¶4-6 ("Dr. Day, along with the Department of Neurosurgery does not value women in this profession, especially strong or outspoken minority women.  Dr. Day makes inappropriate comments to female staff.  At times, he inappropriately touches women in the workplace."); Affidavit

of Dana Thomas #40 ¶12 ("Dr. Day said to Dr. Tuli, 'You're just a girl, you shouldn't be playing with this equipment.'"); Affidavit of Deepa Soni, M.D. #41 ¶¶2-5 ("There were numerous times when I was assisting Dr. Sagun Tuli, in surgery, Dr. Day would come into the operating room ("OR") and ask, 'What are you girls doing?' or say 'Oh, look, girls can do spine surgery.'")

Dr. Tuli asserts that by 2005, the working atmosphere in the Neurosurgery Department was becoming progressively strained by the escalating tension between Drs. Black and Day. (#36 ¶17)  Dr. Day is said to have shouted at Dr. Black and Dr. Tuli during meetings. (#35, Exh. F; #36 ¶17; Affidavit of Carol Gedgaudas #37 ¶7 ("I had heard many stories about Dr. Day being condescending, rude, and intimidating."), ¶9 ("I have continued to observe Dr. Day yelling and screaming at people in the operating room.  He yells at residents in a very degrading manner."); #40 ¶4 ("I have observed Dr. Arthur Day yelling at people in the OR on several occasions.  Out of all of the neurosurgeons, Dr. Day yells the most."); #41 ¶6 ("[H]e (Dr. Day) began shouting at me and banging his clenched fists on the table.  He would then lean over his desk, shouting, swearing, and pointing at me, with spit coming out of his mouth."))

The plaintiff claims that she "had to compete with Dr. Day for resident

10

time for surgeries and clinic," but since he was the Residency Program Director he made sure that his own surgeries and clinics were given priority. (#36 ¶26) Further, in her view, certain residents were allowed to do whatever they pleased, i.e., not answering pages or not showing up for clinical duties, and, despite speaking to Dr. Day about these concerns, nothing ever changed. (#36 ¶¶27-28; #37 ¶15 ("There was a point in time when I noticed that certain residents would not respond to Dr. Tuli's pages.", ¶16 "[I]t was apparent to me that these two male residents did not feel it necessary to assist Dr. Tuli."); #41 ¶11)  While she had problems with a couple of residents, according to the plaintiff she enjoyed a cordial relationship with most of them. (#36 ¶28)

In mid-2005, Dr. Tuli claims to have become aware of a party to be hosted by the residents where "there would be kegs of beer, strippers and cages for dancing." (#35, Exh. F; #36 ¶26; #41 ¶12; Deposition of Eileen Hardy #53, Exh. 2)  The plaintiff discovered that the incoming female Chief Resident was excluded from the party since she was scheduled to be on-call and that a medical device company was contributing funds to cover the expenses of the party. (#36 ¶30; #41 ¶12)  As the Professionalism Officer, Dr. Tuli felt compelled to speak up about these various improprieties and ultimately the funding offer was withdrawn and the party was held without the kegs of beer

11

or cages. (#36 ¶30)

At a meeting of the BWH neurosurgeons in July, 2005, Dr. Tuli showed support for a female resident of Indian descent who had been fired in early 2005, five months shy of completing her residency. (#36 ¶¶18, 31) Subsequent to her termination, this resident had filed a discrimination claim naming Dr. Day as a defendant. (#36 ¶18) The plaintiff believes that Dr. Day has retaliated against her for supporting that female resident, including making efforts to turn the residents against her and permitting residents to shirk their obligations to her. (#36 ¶¶31-33, 35)

In July of 2005 Dr. Tuli met with Dr. Whittemore to share her concerns about how Dr. Day treated her. (#36 ¶34) Although Dr. Whittemore promised to look into the situation, in her view nothing changed. (#36 ¶35) Dr. Tuli "continued to have challenging interactions with Dr. Day regarding patient care." (#36 ¶¶36-38)

At the end of the summer/beginning of the fall of 2005, one of the chief residents made charges against Dr. Tuli and she, in turn, made charges against him. (#49, Exh. C ¶9; Exh. J; Exh. K) Thereafter the Human Resources ("HR") Department of BWH launched an investigation within the Neurosurgery

12

Department.[5] (#36 ¶40; #49, Exh. C ¶9)

In September, 2005, Dr. Tuli attempted to clear the air with Dr. Day but, upon going to his office to speak with him, Dr. Day

> spoke for almost three hours. At one point, Dr. Day described our relationship as similar to that of "lovers". He sat in a chair next to me, with his hand on my arm a few time (sic). I felt very uncomfortable. He said that I had "cheated" on him by disagreeing with him and by "going after him" at M&M conferences....He called me "deranged"....At the end of the meeting I went to shake his hand, but he put his arm around me for a prolonged period. I felt very uncomfortable.

Affidavit of Sagun Tuli, M.D. #36 ¶41.

The plaintiff met with Dr. Whittemore again in August and September of 2005, but she felt he was "dismissive" and sick of her making appointments with him.

---

[5]

Among the summary findings made by HR in an October 4, 2005 report subsequent to the investigation were the following:

> 4. Dr. Tuli's behavior needs to be addressed but it is hard for us to determine whether a lot of her outbursts and behavior are caused by the fact that she is severely overworked and placed into a senior position prematurely because of her colleagues (sic) departures or if her behavior reflects her true personality. She clearly feels she has been harassed, especially by Dr. Day, and has sought help but according to her not received it. Some type of intervention needs to take place to address and mitigate her behavior but also to investigate her concerns with Dr. Day and the Residents and address them as necessary so they can have a civil, professional relationship.
>
> *****
> 6. Dr. Day should be reminded about the appropriate manner in which to address colleagues, especially women in the worksetting.

Opposition of Defendants #49, Exh. L; #35, Exh. A.

(#36 ¶41)

In October, 2005, Dr. Tuli's privileges at BWH were renewed. (#36 ¶43) At that time she shared her concerns about the Neurosurgery Department with Dr. Black. (#36 ¶43)  Dr. Tuli believed that she was not being afforded the same level of support as male doctors even though she alone was carrying all of the patients on the spine service. (#36 ¶44)

### 2. 2006 - The Interactions with Dr. Whittemore

At the beginning of 2006 Dr. Tuli brought various concerns about the way Dr. Day treated her, i.e., his insensitivity to her call schedule, his dismissiveness, to the attention of Janet Barnes. (#35, Exh. B at 104-105)  Ms. Barnes recommended on several occasions that Dr. Tuli should speak with Dr. Whittemore, the Chief Medical Officer at BWH, about her concerns. (#35, Exh. B at 106)

The plaintiff met with Dr. Whittemore in December, 2005, and then again with Drs. Whittemore and Shapiro[6] in January of 2006 to discuss "the same

---

[6]

Dr. Jo Shapiro is, according to plaintiff, "one of the heads of the BWH Professionalism Program. "(#36 ¶33)

14

concerns of hostile work environment and disparate treatment."[7] (#36 ¶¶45-46; #49, Exh. C ¶8)  Indeed, Dr. Tuli's meetings with Dr. Whittemore continued on an ongoing basis through 2007. (#36 ¶¶52, 55, 58, 62, 63; #49, Exh. C ¶8)  Dr. Tuli and Dr. Whittemore have quite different views of these meetings.  For example, while the plaintiff states that Dr. Whittemore told her that it would be "ill advised" to bring her concerns to HR, Dr. Whittemore states that he "advised her to bring any complaint of discrimination to Susan Gormley in the Human Resources Department" and provided Dr. Tuli with Ms. Gormley's direct telephone number. (*Compare* #36 ¶46 and #49, Exh. S ("I [Dr. Tuli] agree as you stated Dr. Whittemore that it would be ill advised to take this to HR.") with #49, Exh. C ¶12; Exh. N[8]; Exh. P "I [Dr. Whittemore] also reiterated my concern that some of the allegations she [Dr. Tuli] brought forth really should be investigated according to our institutional processes through HR."))

Dr. Whittemore received a lengthy letter dated April 7, 2006 from Dr. Tuli

---

[7]

The plaintiff's complaints generally were that Dr. Black did not promote her to Director of Spine, that she was not being adequately compensated for the work that she was doing, that there was no official plan for spine call and that Dr. Day was turning the residents against her. (#49, Exh. C ¶14; Exh. P; Exh. S)

[8]

Exhibit N is an e-mail from the plaintiff to Dr. Whittemore dated December 16, 2005, the day after their meeting, and Dr. Whittemore's response thereto wherein Dr. Whittemore states "if you believe that you are being subjected to discriminatory treatment, I suggest you contact Susan Gormley in Human Resources (525-3103) and discuss your concerns with her.  If you prefer, I would be happy to set up a meeting with you, Peter and myself to discuss these issues further."

raising her concerns about issues that "range from outrageous sexist comments, repeated over time in many contexts, racist remarks, religious remarks, pay and promotion disparities and now false defamation." (#36, Exh. I; #49, Exh. C ¶¶17-18, 23; Exh. U) Dr. Tuli also complained that her reputation was "actively being damaged."[9] (#49, Exh. C ¶18; Exh. U) Dr. Whittemore responded by e-mail on April 10th, advising Dr. Tuli that her concerns "mandate our concerted attention and subsequent investigation" and that the "allegations are intolerable and we need to address them with and for you, and for the institution." (#49, Exh. W) Dr. Whittemore noted that he had been in contact with Joan Stoddard, BWH's attorney, and that they thought HR should be involved "to outline the best course of action and to assure [Dr. Tuli's] protection in the process." (#49, Exh. W)

On April 11, 2006, Dr. Tuli and Dr. Whittemore had a meeting. (#49, Exh. X) The plaintiff's April 7th letter was discussed, and Dr. Whittemore advised Dr. Tuli that "she had rights protected under law, including protection from retaliation." (#49, Exh. X) Dr. Whittemore also told Dr. Tuli that changes

---

[9]

Dr. Tuli complained about BWH's alleged "[f]ailure to give [her] authority, title and pay commensurate with [her] duties compared to male colleagues" noting specifically by way of comparison that Dr. Dong Kim "has been paid more and promoted ahead of me." (#49, Exh. U) Dr. Whittemore states that in complaining about the disparities in treatment between herself and Dr. Kim, the plaintiff ignored the fact that Dr. Kim had four more years of experience than she had. (#49, Exh. C ¶21)

were coming to the department, but because of the dysfunction the "road to recovery [would be] extraordinarily difficult, prolonged, and uncomfortable." (#49, Exh. X)  Given these circumstances, Dr. Whittemore "wondered with [Dr. Tuli] whether this was the right place for her to continue at this particularly vulnerable point in her career" and whether "[s]he really might benefit from moving to another setting with a clean slate such that she can grow both clinically and academically in a more stable environment." (#49, Exh. X)

On April 12, 2006, Dr. Tuli wrote an e-mail to Dr. Whittemore thanking him for his concern and his prompt action in enlisting the aid of HR and also the legal department to protect her from retaliation. (#49, Exh. Z) The plaintiff expressed her willingness to meet with HR. (#49, Exh. Z)  Dr. Tuli indicated that she had hired an attorney, not "to escalate the matter, but to work with me and Hospital Counsel to further our joint interests of eliminating discrimination and allowing me to work unencumbered by attacks, falsehoods and blatant inequality." (#49, Exh. Z)

By letter dated June 16, 2006, Dr. Tuli's attorney wrote to Joan Stoddard of the Office of General Counsel for BWH, wherein she stated:

> Dr. Tuli acknowledges and appreciates the current efforts being made to set a new course for her Department.  She thus proposes holding her grievance

and any formal investigation in abeyance until the end
of the summer, in order to allow Dr. Whittemore to
address issues within Neurosurgery.

Defendants' Opposition #49, Exh. AA.

Dr. Whittemore asserts that "the Hospital acquiesced to Dr. Tuli's request not

to confront Dr. Black or Dr. Day with the allegations made by Dr. Tuli.  This is

true up through the date she filed this legal action." (#49, Exh. C ¶28)

After Dr. Black stepped down as Chairman, from July of 2006 through

June of 2007, Dr. Whittemore served as the Interim Chair of the Neurosurgery

Department and, together with Michael Zinner, M.D. (hereinafter "Dr. Zinner"),

acted as the Members of the Interim Executive Council of the Department of

Neurosurgery. (#49, Exh. C ¶7; Exh. D ¶7)  During this year-long period, Dr.

Day again "had no authority to hire, fire, promote or demote any of the medical

professional staff"; "had no role relative to the compensation any member of the

Department was paid"; and "had no authority with regard to the setting of the

call schedule for the Department." (#49, Exh. C ¶29; Exh. D ¶8)

In an office note from a meeting with Dr. Tuli on August 17, 2006, Dr.

Whittemore related that the two had discussed the plaintiff's compensation and

that she would again likely be receiving a bonus, but that the books had not yet

closed for the year. (#49, Exh. DD)  Dr. Whittemore advised Dr. Tuli that a new

18

plan for the call schedule would be implemented at the next faculty meeting.[10]

(#49, Exh. DD)  The "issue of leadership" was discussed, i.e., Dr. Tuli being

named Director of Spine, but Dr. Whittemore had proposed that the divisional

structure of the Department be dismantled as of October 1, 2006. (#49, Exh.

DD)  As a consequence, Dr. Whittemore determined that he had:

> no intention of creating a division chief of spine at this
> stage of the game, for a division of 1, for a division that
> is not going to exist for more that (sic) a few weeks,
> and in the setting of recruiting a new chief of
> neurosurgery who may very well want to restructure
> the department along different lines, including
> bringing in a senior spine surgeon to become the
> director of that field under new leadership.

Defendants' Opposition #49, Exh. DD.[11]

Although Dr. Tuli related ongoing angst regarding the situation with Dr. Day

and another physician, Dr. Dong Kim, the plaintiff remained unwilling to permit

Dr. Whittemore to confront Dr. Day with her allegations and he felt

"handcuffed". (#49, Exh. DD) Lastly in that office note, Dr. Whittemore wrote

the following:

---

[10]

    An e-mail from Dr. Tuli to Dr. Whittemore reflects that, in fact, a reorganization of spine call was done as of October 1, 2006. (#49, Exh. FF)

[11]

    Dr. Whittemore noted that Dr. Black had been unwilling to accede to Dr. Tuli's request that she be appointed Division Chief "telling Sagun flat out that she is not a 'team player'". (#49, Exh. DD)

> Sagun really continues to have very little insight into her role in creating her own problems. Her general lack of collaborative spirit, based on whatever foundation, consistently prevents her from developing satisfactory interpersonal relationships, in fact the trend is just the opposite. I have not yet shared with her the confidential HR report from last fall, which clearly pointed to her role in a particular incident that prompted the review and the widely held perception of her being a "difficult individual". I have addressed this in a generic sense with her in the past, and this is particularly problematic given her role as the professionalism officer for the department, having been appointed as such by Dr. Black. Examples of the inappropriateness of this appointment and her difficult nature include recent incidents involving sharing microscopes in the operating room, calling in profusionists (sic) to run the cell saver off hours and on weekends, and inappropriate scheduling. I have talked to her about all these incidents, and again she feels that I am basically devaluing her, concentrating on the negatives and not rewarding the positives.

Defendants' Opposition #49, Exh. DD.

At her annual performance review on November 3, 2006, Dr. Whittemore found Dr. Tuli to be "a clinically adept spine surgeon" who "provides superb surgical care for her spine patients." (#49, Exh. EE) The plaintiff's financial performance was also deemed to be "excellent." (#49, Exh. EE) However, the annual review was not all glowing:

> The major issue confronting us regards Sagun's behavior as perceived by nearly every segment of the

20

provider environment.  As I have discussed with her in the past, she has had negative interactions with her own colleagues, the vast majority of resident staff, the orthopedic spine surgeons, anesthesiologists, perfusionists and emergency room personnel.  She is perceived at the very least as dismissive but more often verbally abusive and insensitive.  And I have told her that I expected that behavior to dramatically change within the next few months, otherwise we would need to put into play some form of remediation for her to continue to participate here in the Department.  It has been made clear to me by both attendings and residents that her continued erratic and abusive behavior is perceived as the "tail wagging the dog" and that tolerating this behavior has made a significant dent in the Department's overall morale.

Defendants' Opposition #49, Exh. EE.

On November 28, 2006, Dr. Whittemore met with Dr. Tuli to discuss changes to the process by which adverse outcomes were reported to the QARM Committee. (#49, Exh. GG)  Dr. Tuli stated that the residents failed to report all patient complications to her. (#36 ¶62)  Going forward, it was decided that Dr. Whittemore would receive the cases weekly from the Chief Residents and would then review them with Dr. Tuli and together they would determine which cases must be reported to the QARM Committee. (#49, Exh. GG)  From Dr. Whittemore's perspective, the change in the process, of which all Neurological faculty were advised, was intended to ensure "that Sagun would

not be viewed as a target by the remainder of the department in carrying out her assigned duties." (#49, Exh. GG)   Dr. Tuli saw the change as Dr. Whittemore "taking away the majority of [her] responsibility for the M&M list." (#36 ¶62)

On December 22, 2006, Dr. Whittemore sent an e-mail to Dr. Tuli in which he stated: "Sagun, I am getting great feedback regarding your overall demeanor.  Great work, and have a terrific holiday." (#53, Exh. 4)  Dr. Tuli replied: "Thank you for your kind word.  Happy holidays to you and your family." (#53, Exh. 4)

### 3.  2007 - Dr. Day Becomes Chair of Neurosurgery Department

By letter dated June 25, 2007, Joan Stoddard advised Dr. Day of the following with respect to his upcoming promotion:

> I write to confirm that Partners HealthCare and Brigham & Women's Hospital have asked that David Casey of Littler Mendelson meet with you on a periodic and as needed basis to assist you in your new role as Chair of the Neurosurgery Department.  In light of the complaints of discrimination that have been brought against you, we believe that it is appropriate to provide you with both guidance and support in addressing various personnel management issues that currently exist and that may arise within the department during the transition of authority from Peter Black to you.

Plaintiff's Reply #53, Exh. 7.

In an e-mail to Dr. Day, Dr. Whittemore referred to David Casey as "our mutual 'coach'". (#53, Exh. 6)

Dr. Tuli contends that at the end of June, 2007, one of Dr. Day's clinical fellows performed a wrong-side craniotomy and the patient ultimately died. (#36 ¶68) This complication was not put on the M&M list or reported at the Neurosurgical Department rounds, purportedly because Dr. Day would not allow it. (#36 ¶68) According to Janet Barnes, Dr. Day had e-mailed risk management the day after the surgery to advise them of the wrong-side craniotomy. (#49 ¶ZZ) The case was not reported on the M&M list or evaluated by the QARM committee because a wrong side procedure "is a mandated report by the Board of Registration of Medicine and we did what is referred to as a root-cause analysis of the case itself." (#49 ¶ZZ) Ms. Barnes further testified that at no time in 2007 had she had any reason to inquire into Dr. Day's complication rate or any reason to question whether Dr. Day's case complications were being reported appropriately. (#49, Exh. AAA)

On or about July 1, 2007, Dr. Day assumed the position of Chairman of the Department of Neurosurgery. (#49, Exh. C ¶39; Exh. D ¶9) When Dr. Tuli requested that she be promoted to Director of Spine, Dr. Day allegedly told her

23

"I want my guy" to be the Director of Spine and that "he wanted [Dr. Tuli] to continue to be a 'slave' for the department and be on call every other week, and continue to take care of the whole spine service." (#36 ¶65)  Dr. Day also purportedly advised the plaintiff that she could no longer do research and that Dr. Day would choose research for her. (#36 ¶66)

### E.  2007 - Review of Patient Complaints and Compliments about Dr. Tuli

In August of 2007, Joanne Hastings, the manager of the Provider Services department at BWH, as part of her routine practice when physicians are up for reappointment, "reviewed the Complaints and Compliments for Dr. Tuli." (#49, Exh. LL ¶9)   The first complaint against Dr. Tuli was a February 15, 2006 formal grievance lodged by the primary care physician of a patient who was seen by Dr. Tuli. (#49, Exh. MM)  The primary care physician claimed that Dr. Tuli had been rude to the patient, had not taken the patient's history in order to make an assessment and had not done a thorough examination. (#49, Exh. MM)  The patient felt that she was discriminated against because she was Spanish speaking. (#49, Exh. MM)   The complaint was categorized as one about attitude, the appropriateness of comments and customer service/overall attitude. (#49, Exh. MM)

An informal complaint against Dr. Tuli was made on April 19, 2006 by the

24

husband of a patient who was never told that his wife had been taken up to her room and he was left waiting for a lengthy period of time in the Family Liaison waiting room. (#49, Exh. MM)  The incident was categorized as accessibility, i.e., delay in test results and wait time to see clinician, and communication about condition/plan of care. (#49, Exh. MM)

On May 16, 2006, an informal complaint about the plaintiff was received from a patient's father. (#49, Exh. MM)  The son needed a letter from a doctor in order to return to work and Dr. Tuli told him to get one from his primary care physician while the primary care physician stated that since it was a head trauma case, the neurosurgeon was responsible for writing the letter. (#49, Exh. MM) The father complained that the communication with Dr. Tuli's office "had not been great." (#49, Exh. MM)  The issue was categorized as one of accessibility and responsiveness. (#49, Exh. MM)

A patient in Ambulatory Care complained on July 13, 2006, that Dr. Tuli "was rude, disrespectful, and inappropriate." (#49, Exh. MM)  The patient had been referred to Dr. Tuli for a "specialized spinal problem" and, upon meeting the patient, Dr. Tuli purportedly said "'I shouldn't have agreed to see you.'" (#49, Exh. MM)  The issue was categorized as attitude, specifically, the appropriateness of comments. (#49, Exh. MM)

25

On September 28, 2006, a patient who was also a BWH employee filed a formal complaint/grievance against Dr. Tuli after seeing her in the clinic for neck pain. (#49, Exh. MM)  The patient stated that she had had "'a horrible experience'", that Dr. Tuli was an hour and a half late for the appointment and then was "very rude, cold, and brushed her off." (#49, Exh. MM)  The patient claimed that she did not get the treatment to which she was entitled, and planned to file a grievance with her insurance carrier as she refused to pay her copay. (#49, Exh. MM) The incident was categorized as accessibility (wait time), attitude (appropriateness of comments/customer service/overall attitude) and care/treatment (overall quality of care).

On November 3, 2006 an informal complaint was made against Dr. Tuli because a patient's wife was upset when she thought that her husband was going home from the hospital, but more tests had been ordered and he might not have been medically ready to leave. (#49, Exh. MM)  The complaint was categorized as discharge, to wit, patient/family readiness for discharge. (#49, Exh. MM)

A patient (and former employee) filed a formal complaint/grievance against the plaintiff on December 11, 2006. (#49, Exh. MM)  The patient had been referred to Dr. Tuli by his primary care physician. (#49, Exh. MM)  Upon

26

calling Dr. Tuli's office he was advised that the doctor would be out for three days, but, after waiting, he never received a call back. (#49, Exh. MM)  Upon calling Dr. Tuli's office again, he was told by the secretary "that the doctor looked at his chart and was going to refer him to someone else and that he didn't need surgery." (#49, Exh. MM)  He found this interaction to be "atrocious"; his primary care physician was "appalled" and referred him to another doctor. (#49, Exh. MM) This complaint was categorized as accessibility (difficulty reaching a live person on the telephone), attitude (appropriateness of comments/customer service/overall attitude), care/treatment (overall quality of care) and responsiveness (time to return phone call). (#49, Exh. MM)

An informal complaint against Dr. Tuli was received on February 7, 2007. (#49, Exh. MM)  A patient who had been admitted through the Emergency Department and had undergone emergency spinal surgery called the hospital to complain that he had not been informed that he had a malignant renal tumor prior to his discharge from BWH. (#49, Exh. MM)  Dr. Tuli was the attending physician, but it was determined upon investigation that the "Inpatient Attending Team" had not known about the tumor "as the radiology report was produced after the surgery." (#49, Exh. MM)

A patient made an informal complaint about Dr. Tuli on April 5, 2007

27

because the plaintiff refused to complete a disability form that the patient needed after Dr. Tuli ordered the patient to stay out of work until the seriousness of her injury could be evaluated. (#49, Exh. MM)  This complaint was categorized as communication (about condition/plan of care and time spent communicating with patient) and responsiveness (time to return telephone call).

On June 1, 2007, a patient of Dr. Tuli wrote a letter "expressing her dissatisfaction with her care at BWH." (#49, Exh. MM)  This complaint was categorized as care/treatment, specifically the technical skills of the staff. (#49, Exh. MM)

Dr. Tuli also had three compliments on file at the time of the October, 2007 Credentials Committee meeting.  On January 23, 2007, a patient wrote a letter thanking Dr. Tuli and her team "for doing a great job on his surgery." (#49, Exh. MM)  On May 22, 2007, a patient wrote a thank you note to Dr. Tuli (#49, Exh. MM) and on the same date another patient wrote a card to Dr. Tuli "thanking her for 'making me walk again.'" (#49, Exh. MM)

F.  2007 - Proceedings Re: Dr. Tuli's Reappointment

After reviewing Dr. Tuli's file, Ms. Hastings "determined that based on the nature and severity of the Complaints, ...Dr. Tuli was appropriately a Category 2." (#49, Exh. LL ¶9)  Ms. Hastings instructed one of her employees, Mary Beth Mann, to send a letter to Dr. Day as Chairman of the Department of Neurosurgery informing him that Dr. Tuli was up for reappointment and that she would be presented as a Category 2 candidate at the next Medical Staff Credentials Committee ("Credentials Committee") meeting. (#49, Exh. D ¶10; Exh. KK ¶¶6-9; Exh. LL ¶¶6-7)  Dr. Day was further advised in the August 28, 2007 letter that "[t]he [Credentials Committee] may recommend that Dr. Tuli attend a Physician Health Services session";[12] this advice was "based on the BWH Provider Services office's past experience with the way these matters were usually handled by the [Credentials Committee]." (#49, Exh. D ¶11; Exh. KK ¶10; Exh. LL ¶10)

A Category 2 candidate for credentialing is a doctor who meets one or more of eight listed criteria, i.e., if, "[w]ithin the past five years, a malpractice

---

[12]

The Massachusetts Code of Regulations provides that "[t]he health care facility, pursuant to its by-laws or by agreement with the licensee, will require the licensee to undergo a mental or physical examination, if requested by...the credentials committee." 243 C.M.R. §3.05(j).

judgment or settlement over $1 million dollars has been made" or if "[t]he physician has been involved in any criminal proceedings" or if "[t]here have been complaints against the physician from patients, physicians, nurse/allied health professionals, the Medical Staff Committee or the administration." (#49, Exh. F)  When all of the eight criteria questions are answered in the negative, the physician is a Category 1 candidate. (#49, Exh. F)

As Chairman of the Department, Dr. Day completed the paperwork for Dr. Tuli's Category 2 appointment on September 26, 2007.[13] (#49, Exh. MM)  With respect to the Category 2 issue, Dr. Day wrote that the Dr. Tuli might "consider further training in communication skills (aimed at malpractice prevention), how to deal with others to get group dynamics to work positively." (#49, Exh. MM; Exh. D ¶12)   In rating the plaintiff's humanistic qualities and professional attitudes and behavior, Dr. Day wrote that she needs attention due to "episodic, unpredictable, volatile behavior where she becomes hostile, vindictive, irrational & demanding - she becomes attacking to whomever is nearby - has had highly charged interactions with patients, faculty, residents and OR personnel." (#49, Exh. MM)   With regard to Dr. Tuli's health status, Dr. Day wrote that her

_____

[13]

This paperwork was the standard fare, having been completed by Dr. Woodard and Dr. Black in the past for Dr. Tuli's prior credentialing. (#49, Exh. E, Exh. F, Exh. G)

physical health was "superior" but her mental health was "questionable." (#49, Exh. MM)  In the comments section, Dr. Day wrote "episodic actions with patients/personnel, others creates environment of 'danger' — hard situation to — confidence as a reliable team member; her unpredictability is a fertile substrate for repeated patient/cofaculty problems despite her clinical skills/intelligence." (#49, Exh. MM)

On October 1, 2007, Dr. Whittemore met with Dr. Tuli to go over with her the process for her re-credentialing and the fact that she was being presented as a Category 2 candidate. (#36 ¶72; #49, Exh. OO) According to Janet Barnes, such a meeting with the CMO before a credentialing committee meeting was not the usual practice. (#35, Exh. B at 135)  In his office note from that meeting, Dr. Whittemore wrote:

> Next, apparently at some point in September, Linda Aglia, head of Neurosurgical Anesthesia, made Dr. Day aware as Chairman, of recent behavior on the part of Dr. Tuli which has made it increasingly difficult for the OR team to work constructively with her.  Sagun explained the situation which stemmed from a specific nurse who is known to be very "slow", and Sagun's insistence that she pick-up the pace.  Sagun apparently apologized to both the nurse and Anesthesia staff and ultimately went out to dinner with the 2 anesthesiologists in an effort to resolve the issues at hand.  The dinner was apparently amiable and constructive. Nevertheless, this behavior is reminiscent

31

of her behavior prior to 6-8 months ago and echoes the feelings emerging from the DFCI which Dr. Day has summed up as "we just don't want to work with her, she's too difficult". Dr. Day feels that the vigor of the spine service has dwindled as a direct result of this dysfunctional relationship.

Defendants' Opposition #49, Exh. OO; *compare* #36 ¶¶69-70.

Jonathan Coblyn, M.D. (hereinafter "Dr. Coblyn") is a licensed physician in the Commonwealth of Massachusetts who is employed at BWH. (#49, Exh. QQ ¶3) Dr. Coblyn serves as the Chairman of the Credentials Committee and was present at the October, 2007 Credentials Committee meeting when Dr. Day presented Dr. Tuli for reappointment.[14] (#49, Exh. QQ ¶¶3, 4) From Dr. Coblyn's perspective, patient complaints about a doctor constitute "red flags" in reviewing the physician, and Dr. Tuli had "a number" of patient complaints lodged against her.[15] (#49, Exh. QQ ¶¶5, 6) After hearing from Dr. Day and discussing the matter amongst themselves, members of the Credentials Committee voted to re-credential Dr. Tuli as a Category 1 for four months so

---

[14]

Dr. Frerichs is the representative of the Neurosurgery Department on the Credentials Committee, but was on vacation at the time Dr. Tuli was to be presented for review. (#49, Exh. V ¶13) According to Dr. Frerichs, "[t]he fact that the chairman of a Department would present members of the department to the [Credentials Committee] would not be unusual and has happened before." (#49, Exh. V ¶14)

[15]

According to the defendants, the Credentials Committee has only been required to consider patient complaints as part of the reappointment process since January 10, 2006. (#49, Exh. RR)

32

long as she was evaluated at Physician Health Services (hereinafter "PHS") and agreed to then follow any recommendations resulting from that evaluation. (#49, Exh. QQ ¶7)

According to Janet Barnes, a member of the Credentials Committee who attended the October, 2007 meeting, in his presentation Dr. Day noted that patient complaints about Dr. Tuli had been brought to his attention,[16] but that he was more concerned about the plaintiff's interpersonal relationships and interactions with BWH staff. (#49, Exh. PP)  Dr. Day stated that while Dr. Tuli was an excellent surgeon, her behavior was volatile and her mood would swing from being calm to the other extreme. (#49, Exh. PP)  It was his understanding that about thirty members of the operating room staff did not want to work with Dr. Tuli[17], and that he believed she would benefit from some anger management training. (#49, Exh. PP)  Dr. Frerichs, although not present at the

---

[16]

The evidence is that Dr. Day received copies of these complaints from the Provider Services department at BWH along with the paperwork for Dr. Tuli's Category 2 appointment. (#49, Exh. MM)  Janet Barnes testified that Dr. Coblyn as Chairman of the Credentials Committee, Dr. Day as the person presenting Dr. Tuli to the Credentials Committee and Joan Stoddard of the legal department all would have received copies of the complaints and compliments on file for Dr. Tuli. (#35, Exh. B at 131)  Other members of the Credentials Committee did not have copies of the complaints or compliments. (#35, Exh. B at 152)  They did know the number of complaints which had been lodged against Dr. Tuli.  (#35, Exh. B at 171-172)

[17]

The nurse in charge at BWH, Susan Lovell, testified that in the fall of 2007 it was not true that there were thirty people who would not work with Dr. Tuli in OR. (#35, Exh. E)  However Eileen Hardy, an OR nurse, testified that it may, in fact, have been true although she agreed that Nurse Lovell would be in the best position to know. (#35, Exh. F)

33

October, 2007 Credentials Committee meeting, has testified that it would have
been important for the committee to know that Dr. Tuli had made numerous
complaints against Dr. Day and the manner in which he treated her. (#35, Exh.
C)

In his affidavit, Dr. Day attests that he did his "best to present Dr. Tuli in
a fair and honest manner." (#49, Exh. D ¶15)  According to Janet Barnes, Dr.
Day was asked by one of the committee members if he would be disappointed
if Dr. Tuli was not reappointed and Dr. Day responded that no, he would not
be disappointed. (#35, Exh. B at 139-140)  Dr. Day closed his presentation "by
stating that [he] wanted Dr. Tuli to be re-credentialed by the Committee, and
that [he] thought a recommendation for some interpersonal training would
allow her the best chance to be as successful as she should be." (#49, Exh. D
¶17; #35, Exh. B at 141-143)  Further, Dr. Day categorically denies that he has
treated the plaintiff "at any time in a discriminatory or disparate manner", that
he has "ever taken any retaliatory actions against her in any way" or that he
"had any ulterior motive in presenting her to the [Credentials Committee]."
(#49, Exh. D ¶23)

Dr. Tuli met with Dr. Coblyn subsequent to the October, 2007 Credentials

34

Committee meeting.[18] (#36 ¶78)  According to the plaintiff, Dr. Coblyn told her that the committee's "decision was based on Dr. Day's assessment and recommendation" and that "the patient complaints were of no consequence."[19] (#36 ¶78)  Janet Barnes testified that she thought the committee considered a combination of "Dr. Day's description of … interpersonal behaviors" and the fact that "there were also eight or 10 patient complaints in this period of time." (#35, Exh. B at 171-172)  In a letter dated November 12, 2007, Dr. Coblyn wrote the following to Dr. Tuli:

> Dr. Whittemore has advised me that you would like written confirmation of the information he provided you concerning the vote of the Medical Staff Credentials Committee…with respect to your application for reappointment to the medical staff. Due to concerns about issues of interpersonal

---

[18]

In his affidavit, Dr. Frerichs avers that:

> Between the October 2007 [Credentials Committee] meeting and the December 2007 [Credentials Committee] meeting, Dr. Sagun Tuli approached me several times attempting to seek information about the [Credentialing Committee]'s deliberations in October of 2007 which I had not been part of due to my absence.  I do not recall that during these conversations Dr. Tuli told me that she had made formal complaints about Dr. Day or that she wished the [Credentials Committee] to know this information.

Opposition of Defendants #49, Exh. V ¶18.

[19]

Dr. Tuli claims that she spoke with Dr. Coblyn "a number of times", that he "agreed that the situation was 'ridiculous and insulting'" and "[h]e repeatedly recommended that [she] get an attorney." (#36 ¶79) On his part, Dr. Coblyn maintains his belief that "both the process by which Dr. Tuli's credentials were reviewed, and the decision of the [Credentials Committee] was (sic) fair." (#49, Exh. QQ §20)

communications and behavior (including interactions with members of the medical staff, other hospital employees and patients), you were reviewed as a Category 2 applicant.  After discussion, the Credentials Committee recommended that you be reapppointed for a four month period, and that during that four month period, you contact Physician Health Services (PHS) and obtain an evaluation and recommendations by them with respect to these issues.  This recommendation was approved by a committee of the Board of Trustees pursuant to the medical staff bylaws.

We also ask that you agree to allow PHS to provide a copy of their recommendations to Dr. Whittemore, Joan Stoddard, who serves as counsel to the Credentials Committee, and me.

Your four month reappointment will expire on February 29.  It is my expectation that Credentials Committee will not recommend further reappointment unless it has received the recommendations from PHS along with an acknowledgment from you that you intend to comply with these recommendations.

Affidavit of Sagun Tuli, M.D. #36, Exh. L[20].

At some point after the October, 2007 Credentials Committee meeting,

Janet Barnes testified that she expressed concern to Dr. Coblyn in that:

---

[20]

When questioned at a hearing on April 17, 2008, the defendants' attorney stated that Dr. Tuli was not required to sign a release and all BWH needed to know from the plaintiff was that she went to PHS, what recommendations were made and that she followed any recommendations that were made.  Counsel then stated that BWH would need to know *from PHS* whether recommendations were made and whether Dr. Tuli was following them.  However, revelation of the latter information from PHS would not be forthcoming unless the plaintiff did sign a release.  The bottom line is that the statements made by defendants' attorney are contradictory.  In these circumstances, to the extent that the documentary evidence is at odds with the attorney's representations, the Court credits the documents.

> [T]his was the first time that the committee had
> addressed behavioral issues of a female surgeon. And
> that in my two years on the committee, I had not seen
> a similar review of other male surgeons whose
> behavior could have been characterized similarly.

Affidavit of Margaret M. Pinkham, Esq. #35, Exh. B at 174.[21]

Dr. Coblyn and Janet Barnes agreed that it might behoove the committee to

obtain additional information about Dr. Tuli. (#49, Exh. QQ ¶8)  There was a

concern about the lack of specificity about the events presented by Dr. Day.

(#35, Exh. B at 145-146, 158-159, 181)  Upon request, Dr. Whittemore agreed

to, and did attend, the December meeting of the Credentials Committee and

proffered his perspective on the plaintiff.[22] (#49, Exh. QQ ¶¶9-12)  Dr. Coblyn

states that in addressing the Credentials Committee, Dr. Whittemore

> discussed his interactions with Dr. Tuli during his year
> as Acting Chair of the Department, and dating even
> further back, and outlined her issues including her
> complaints about unfair spine call as well as complaints

---

[21]

Janet Barnes agreed that she was a little emotional about the outcome of the Credentials Committee meeting and her conversations with the plaintiff: "Because I care about Dr. Tuli. It has been emotional – it is a difficult thing to see a friend go through something like this. That's how I feel about her." (#35, Exh. B at 189-190)

[22]

It appears that Janet Barnes "mentioned" to Dr. Coblyn that Dr. Tuli had made multiple complaints against Dr. Day. (#35, Exh. B at 178) She testified that she believed that Dr. Whittemore had informed Dr. Coblyn that Dr. Tuli had come to him a number of times complaining of Dr. Day's treatment of her. (#35, Exh. B at 179) She also testified that at the time Dr. Day made his presentation, other members of the Credentials Committee were not aware that Dr. Tuli had made multiple complaints against him. (#35, Exh. B at 181)

> from some of the residents, and some other staff.  He
> explained that he had met with her on a regular basis
> for over a year and that there had been an internal
> Human Resources investigation in the Fall of 2005 that
> substantiated some of these issues.

Affidavit of Jonathan Coblyn, M.D. #49, Exh. QQ ¶12; Affidavit of Margaret M.
Pinkham, Esq. #35, Exh. B at 197.[23]

Dr. Whittemore departed after addressing the committee and the members of

the Credentials Committee revisited their October, 2007 decision with respect

to Dr. Tuli's credentialing. (#49, Exh. QQ ¶13)  Dr. Frerichs testified that he did

not remember whether Dr. Whittemore informed the committee that Dr. Tuli

had complained about Dr. Day to him on a number of occasions, but that it

would have been important information for the committee to have. (#35, Exh.

C) Janet Barnes testified that she did not believe that Dr. Whittemore made a

full presentation along with the relevant information to the Credentials

Committee. (#35, Exh. B at 202)  After discussing the issue, the Credentials

Committee determined that the October re-credentialing decision "was fair and

---

[23]

Complaints from other staff include e-mails from nursing and resident staff on neuro ICU in late January/early February of 2006. (#49, Exh. R)  In the summer of 2006, there was "a fair amount of discord in the Operating Room as to who has priority over the microscopes" in which Dr. Tuli was involved. (#49, Exh. BB)  Further, it had been brought to Dr. Whittemore's attention that on two occasions Dr. Tuli had "requested urgent cell-saver off hours and on July 4." (#49, Exh. BB)  Dr. Whittemore found that the plaintiff "had no appreciation" of the fact that such services were only available for "true" emergencies. (#49, Exh. BB)  The September, 2007 complaints from Neurosurgical Anesthesia that Dr. Tuli's behavior made it increasingly difficult for the OR team to work with her. (#49, Exh. OO)

appropriate." (#49, Exh. QQ ¶14[24])

The defendants have submitted the Credentials Committee minutes from 2002-2007 meetings. (#48, Exh. RR)   In 2007 it is contended "that approximately 54 individuals were presented as Category 2 applicants.  Of them 11 were re-credentialed with some remedial requirements (including quarterly reviews, PHS evaluations, etc.)  Of these, three were re-credentialed as Category 2, including one of the individuals who had been sent to PHS." (#49 at 19)

The plaintiff asserts that these meeting minute notes demonstrate that Dr. Tuli was treated differently in that the documents "show that only a handful of doctors who have had their credentials reviewed, not once, but twice, between 2002-2007, have been referred to PHS, and that their 'issues' were much more serious than having three patients say they were rude." (#53 at 2)

Dr. Whittemore attests that:

> The evaluations done by PHS at the request of the BWH Credentials Committee are entirely confidential. Unless the person referred specifically signs a release, no information is communicated by PHS to BWH or any other entity.

---

[24]

Dr. Coblyn avers that he "believe[s] that both the process by which Dr. Tuli's credentials were reviewed, and the decision of the Credentials Committee was (sic) fair and in keeping with the BWH's mandate to provide only the highest patient care." (#49, Exh. QQ)  So, too, does Janet Barnes. (#49, Exh. YY ("Q. Was the process that was followed by the credentials committee one that ensured a fair outcome? A. Yes. I think it did."))

> Even with the execution of a release, BWH only learns that the person referred has been evaluated and recommendations have been made.

Defendants' Surreply, #56, Exh. CCC, Supplemental Affidavit of Anthony Whittemore, M.D. ¶¶4-5.

There is some question with regard to the breadth of the confidentiality afforded to the PHS referral and process. Dr. Tuli states that:

> Information regarding credentialing is shared with numerous Brigham & Women's committees, including the [Credentials Committee]..., the CIC (Care Improvement Council), the MSEC (Medical Staff Executive Committee) and the Board of Trustees. The committee members include a number of individuals from every division of the hospital, both physicians and non-physicians. Many of these individuals play a critical role in advancement of my career, and a referral to PHS is viewed as a stigma or "black mark" on a physician's record, and BWH had asked me to waive my privacy rights under HIPPA (Privacy Act of the Health Insurance Portability and Accountablity Act) so that all of the committee members will know of my "treatment" at PHS. If I refuse to waive my right to privacy, it is not clear what effect that will have on my privileges.

Supplemental Affidavit of Sagun Tuli, M.D. #59 ¶2.

The defendants assert that "[a] referral to PHS is not a disciplinary action, and is not reportable to the Board of Registration in Medicine." (#49, Exh. QQ ¶17; Exh. A at 2 ("The focus of this process is rehabilitation, rather than

discipline, to aid a physician in retaining or regaining optimal professional functioning, consistent with protection of patients."; Exh. TT)  Moreover, "[g]etting a PHS evaluation does not impinge on a physician's right to practice; the [Credentials Committee] decision did not restrict Dr. Tuli's privileges in any way." (#49, Exh. QQ ¶18)  Dr. Tuli, on the other hand, contends that:

> The state medical board forms, malpractice insurance forms and the health insurance forms all make detailed and exhaustive inquiry into disciplinary action. Disciplinary action is defined very broadly, and if I am required to submit to an evaluation, whether medical or psychiatric, at Physician Health Services, I will be required to answer YES to questions about whether I have ever been subjected to disciplinary action for the rest of my career, which may affect my ability to obtain insurance and my ability to practice medicine in every state.

Supplemental Affidavit of Sagun Tuli, M.D. #59 ¶1.

Dr. Frerichs, a member of the Credentials Committee, attests "that other physicians have been sent for evaluation and recommendations to Physician Health Services" for reasons such as "disruptive behavior, inappropriate behavior, unprofessional conduct and complaints." (#49, Exh. V ¶16)  So, too, Dr. Coblyn, the Chairman of the Credentials Committee, states that "[t]he [Credentials Committee] has conditioned other physicians' reappointments on a referral to PHS, including physicians who have been asked to be evaluated by

PHS for less complaints than those against Dr. Tuli." (#49, Exh. QQ ¶15; *see also* #49, Exh. C ("The Hospital has sent a number of physicians — men and women, of all ethnic backgrounds — to PHS for evaluations and recommendations, both as part of the credentialing process, and even outside of the credentialing process, based on events that may arise."))

The defendants have filed affidavits from two women, one of Indian descent and one of Asian descent, both of whom have worked with Dr. Day at BWH and attest that they:

> have never seen or heard Dr. Day using sexist, demeaning or belittling language and [they] never saw any "totem pole" or any other offensive statues or anything of the sort described in the Globe article as being in Dr. Day's office. Dr. Day always behaved in a highly professional and respectful manner toward [them].

Defendants' Opposition #49, Exh. UU, Affidavit of Sailaja Srinivasan ¶8; Exh. VV, Affidavit of Rose Du, M.D., Ph.D. ¶11; *see also* Exh. V ¶¶10-11.

A letter of support from members of the staff and faculty in the Departments of Neurosurgery, Neurology, and Neuroradiology at BWH wherein Dr. Day is described as a physician "who is respectful and professional to all, regardless of race or gender" has been filed. (#49, Exh. VV)

Dr. Tuli has submitted affidavits, letters and thank-you notes supporting

her personally and professionally. (#35, Exh. D, E; #37 ¶13 ("[Dr. Tuli] is a very, very competent surgeon, and a great person.); #53, Exh. 8-10)

Dr. Whittemore states that "[t]he Hospital's ability to confirm the appropriate behavior and health of the medical professionals who are providing care at the BWH is critical to its ability to assure optimal patient care and is required by state and federal regulation." (#49, Exh. C ¶47)

In November of 2007 Dr. Tuli filed a complaint with the MCAD; the complaint in the instant case was filed in December, 2007.

### III. The Applicable Legal Standard

The First Circuit has explained that:

> Over time, we have crafted a four-part framework for use in determining whether the grant or denial of preliminary injunctive relief is appropriate. Under this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *See Weaver v. Henderson,* 984 F.2d 11, 12 & n. 3 (1st Cir.1993); *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991).

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1 Cir., 1996); *see also Rosario-Urdaz v. Rivera-Hernandez,* 350 F.3d 219, 221 (1 Cir., 2003).

In this instance it is the plaintiff, as the party requesting preliminary injunctive relief, who "bears the burden of establishing that these four factors weigh in [her] favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1 Cir., 2006)(*citing Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1 Cir., 2003)).    Indeed, the Supreme Court has quoted with approval the observation "'that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.' 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948, pp. 129-130 (2d ed.1995) (emphasis added; footnotes omitted)." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Relying on the case of *Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1 Cir., 1985), Dr. Tuli notes that the First Circuit has found the initial element of the test, i.e., likelihood of success on the merits, to be of "critical" importance. *See Esso Standard*, 445 F.3d at 18 ("'The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.' *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir.2002)."); *Ross-Simons of Warwick*, 102 F.3d at 16

44

("Likelihood of success is the main bearing wall of the four-factor framework.").

However, the First Circuit has also recognized that

> the granting of an injunction is an exercise of equity,
> and the presence of a weak link in the movant's chain
> would forestall our reversing the district court's denial
> under the abuse of discretion standard. Therefore, we
> concentrate on the district court's finding that a
> damages remedy would prove adequate to compensate
> Matrix for any injury. *See Rosario-Urdaz,* 350 F.3d at
> 222 ("Where a plaintiff stands to suffer a substantial
> injury that cannot be adequately compensated by an
> end-of-case award of money damages, irreparable
> injury exists.").

*Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.* 378 F.3d 29, 34 (1 Cir., 2004); *Sampson v. Murray,* 415 U.S. 61, 88 (1974)("We believe that the Court of Appeals was quite wrong in suggesting that at this [preliminary injunction] stage of the proceeding the District Court need not have concluded that there was actually irreparable injury. This Court has stated that '(t)he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies,' *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)." (footnote omitted)); *Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 163 (1 Cir., 2004)("[W]e hold that the district court acted well within the encincture of its discretion in denying a preliminary injunction on the ground that [movant] had failed to make the requisite showing of irreparable harm.")

The bottom line is that it is incumbent on the district court to "consider all four factors." *Air Line Pilots Association, International v. Guilford Transportation Industries, Inc.,* 399 F.3d 89, 95 (1 Cir., 2005).

45

## IV. Discussion

### A.  Likelihood of Success

#### 1.  Introduction

Dr. Tuli claims that she is entitled to an injunction preventing BWH from enforcing the Credentials Committee's determination that she must report to PHS for evaluation and follow the recommendations, if any, PHS might make after the evaluation in order to be reapppointed to her position at BWH.  In seeking this preliminary relief, Dr. Tuli claims that she was the victim of discrimination and retaliation by Dr. Day when he made his negative presentation about her to the Credentials Committee in October, 2007 in violation of Title VII, 42 U.S.C. §2000e *et. seq*, and Massachusetts General Laws chapter 151B §4(1).[25]

In order to be entitled to the injunction, Dr. Tuli must show a likelihood of success in proving that the requirement that she report to PHS for evaluation and that she follow the recommendations, if any, that PHS makes is the product

---

[25]

It is not clear from the papers whether she is making the same claims about BWH by virtue of Dr. Whittemore's "incomplete" presentation at the December, 2007 Credentials Committee meeting.  The evidence and outcome are the same in any event.

of illegal discrimination or retaliation.   Absent illegal discrimination or

retaliation, Dr. Tuli agrees that she is obligated to do what the Credentials

Committee has required.  As is manifest, the Court has set forth at some length

the parties' evidence of the alleged interactions between Dr. Tuli and others at

BWH for the five years preceding the action of the Credentials Committee and

acknowledges that the entire body of evidence is relevant to all of the plaintiff's

claims.  However, the evidence is only relevant to the request for injunctive

relief to the extent that it informs the decision of the Credentials Committee

that Dr. Tuli interact with PHS.[26]

### 2. *How the Discrimination Claim is to be Analyzed*

As is the norm, Dr. Tuli's discrimination claim is first to be examined

within the *McDonnell Douglas* burden-shifting framework:  Initially the burden

falls on the plaintiff to establish a prima facie discrimination case at which point

the burden then shifts to the employer to "articulate some legitimate,

nondiscriminatory reason" for its adverse action. *McDonnell Douglas Corp. v.*

---

[26]

      The Court notes that with respect to the litany recited, there are many disputes of fact which the jury will have to resolve.  The Court's conclusions, recited *infra*, are "statements of probable outcomes." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1 Cir., 1991)(citation omitted).  The Court does not presume to "...predict the eventual outcome on the merits with absolute assurance." *Ross-Simons of Warwick*, 102 F.2d at 16 *citing Narragansett Indian Tribe*, 934 F.2d at 6.

*Green*, 411 U.S. 792, 802 (1973). If the employer is able to satisfy this production requirement, the burden returns to the plaintiff to show that the employer's proffered reason for the adverse action is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.

In order to establish a *prima facie* case of employment discrimination based on national origin or gender, Dr. Tuli must show that she is a member of a protected class, she is qualified for the job she was performing, that she suffered an adverse employment decision, and that persons outside of her protected class did not suffer the same consequences. *McDonnell Douglas*, 411 U.S. at 802; *DeCaire v. Mukasey*, - F.3d -, 2008 WL 642533, *11 (1 Cir., 2008). If Dr. Tuli is able to establish a *prima facie* case of employment discrimination based on national origin and gender, a presumption arises that the defendants intentionally discriminated against her. *DeCaire*, 2008 WL 642533, *12; *Ruiz v. Posadas de San Juan Assoc.*, 124 F.3d 243, 248 (1 Cir., 1997). In order to rebut this presumption, BWH and Dr. Day "need only produce enough competent evidence, taken as true, to enable a rational fact finder to conclude that there existed a nondiscriminatory reason for the challenged employment action." *DeCaire*, 2008 WL 642533, *12; *Ruiz*, 124 F.3d at 248.

If BWH and Dr. Day have articulated a legitimate nondiscriminatory basis for their decision, the burden falls back on Dr. Tuli to "prove not only 1) that the reason the employer articulated for the challenged employment action was a pretext or a sham, but 2) that its real reason was the employee's [national origin and/or sex]." *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 13 (1 Cir., 1998) (citation omitted); *DeCaire*, 2008 WL 642533, *12; *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 19 (1 Cir., 1999).[27] Furthermore, the plaintiff "must do more than cast doubt on the rationale proffered by the employer, . . . the 'evidence must be of such strength and quality as to permit a reasonable finding that . . . [denying employment] was *obviously or manifestly unsupported*.'" *Ruiz*, 124 F.3d at 248 (citation omitted) (emphasis added in original).

Under the case of *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), after a plaintiff proves that "...gender played a motivating part in an employment decision...", the burden shifts to the defendant who, in order to escape liability, must prove by a preponderance of the evidence "...that it would have made the same decision in the absence of discrimination." *Price Waterhouse,* 490 U.S. at

---

[27]
> The First Circuit has written, "[i]n our view, federal and Massachusetts law are now generally aligned on the pretext issue." *Fite v. Digital Equipment Corporation*, 232 F.3d 3, 7 (1 Cir., 2000).

251, 252-3.[28]

### 3. How the Retaliation Claim is to be Analyzed

With respect to retaliation, the First Circuit has quite recently explained that:

> Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), states that it is unlawful for an employer to discriminate against an employee because "he has opposed any practice made an unlawful employment practice ..., or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  The Supreme Court has explained how Title VII's substantive provision differs from this anti-retaliation provision: "The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2412, 165 L.Ed.2d 345 (2006).

*DeCaire,* 2008 WL 642533, *15.

In order for Dr. Tuli to establish a *prima facie* case of retaliation she must "prove

---

[28]

It is unclear whether Dr. Tuli is advancing a discrimination claim under *Price Waterhouse*.  The argument is minimally developed in her papers such that it is limited to her merely alluding to the fact that "'stereotyped remarks' can be evidence of gender discrimination". (*See* #33 at 28)  Under *Price Waterhouse*, "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision.  The plaintiff must show that the employer actually relied on her gender in making its decision." *Price Waterhouse*, 490 U.S. at 251.

by a preponderance of the evidence that '(1) [s]he engaged in protected conduct under Title VII; (2) [s]he suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity.'" *Dressler v. Daniel*, 315 F.3d 75, 78 (1 Cir., 2003) quoting *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 262 (1 Cir., 2000). *See also DeCaire*, 2008 WL 642533, *13; *Torres-Negron v. Merck & Company, Inc.*, 488 F.3d 34, 44 (1 Cir., 2007); *Douglas v. J.C. Penney Co., Inc.*, 474 F.3d 10, 15 (1 Cir., 2007); *Noviello v. City of Boston*, 398 F.3d 76, 92 ( 1 Cir., 2005); *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 22 (1 Cir., 2002); *Ramos v. Roche Products, Inc.*, 936 F.2d 43, 48 (1 Cir.), *cert. denied sub nom. Rossy v. Roche Products, Inc.*, 502 U.S. 941 (1991). "Proof of the Title VII prima facie case gives rise to a legally mandatory rebuttable presumption of, in this instance, retaliation." *Bell v. Potter*, 234 F. Supp.2d 91, 94 (D. Mass., 2002). Under the burden-shifting paradigm, once "a presumption of discriminatory retaliation [is] established, then the burden shift[s] to the employer . . . to articulate a legitimate reason for the adverse employment action." *Bell*, 234 F. Supp.2d at 94; *Calero-Cerezo v. United States Department of Justice*, 355 F.3d 6, 26 (1 Cir., 2004). Lastly,

> [i]f the employer produces evidence of a non-retaliatory reason for its actions and the fact finder

51

> believes it, then the presumption of retaliation
> disappears.  At that point, the plaintiff must prove by
> a preponderance of the evidence that the employer's
> stated reason for the adverse action was mere pretext
> and that, in fact, it was actually taken in retaliation.

*Bell*, 234 F. Supp.2d at 94; *Calero-Cerezo*, 355 F.3d at 26.[29]

### 4. Likelihood of Success on the Discrimination Claim

Understanding that the defendants dispute whether Dr. Tuli has established that she suffered an adverse employment action, the Court shall assume, *arguendo*, that she has and move on to the issue of whether the defendants have articulated a legitimate non-discriminatory reason for their action.  As noted above, the inquiry is identical on both the discrimination and retaliation claims.  In this instance the defendants have met their burden.  The evidence of patient complaints and difficulties working with other hospital staff are sufficient non-discriminatory reasons for the decision to require Dr. Tuli to be evaluated by PHS as a condition of her reappointment.

The burden now switches back to the plaintiff to establish that those reasons are pretextual and that the real reason was discrimination or retaliation.

---

[29]

The plaintiff alleges that Dr. Day's presentation to the Credentials Committee also supports her tortious interference with contractual and/or advantageous relations and her whistleblowing claims.  Since all these claims rise and fall for present purposes on the same evidence, they shall not be discussed separately.

In my judgment, Dr. Tuli has not shown that she is likely to succeed in meeting this burden.

The defendants have offered evidence to show that it was the manager of BWH's Provider Services department who determined, after reviewing the patient complaints against Dr. Tuli, that the plaintiff should be presented as a Category 2 candidate for reappointment. This same manager had her subordinate advise Dr. Day in advance of any presentation on the plaintiff's credentialing that the Credentials Committee could potentially recommend that Dr. Tuli be evaluated at PHS. This advice was given based on the Provider Services department's past experience with the way the Credentials Committee handled such matters. There is no evidence that this initial action which started the process was in any way affected by the fact that Dr. Tuli is a woman or a member of a protected class.

Dr. Day received this information and the paperwork for Dr. Tuli's Category 2 reappointment in his capacity as Chairman of the Neurosurgery Department. He had assumed that position just three months earlier. In completing the paperwork, Dr. Day wrote that Dr. Tuli might benefit from training in communication skills and dealing with others because she displayed volatile, unpredictable behavior at times, engaging in "highly charged

interactions with patients, faculty, residents and OR personnel."

Because Dr. Frerichs, the Neurosurgery Department representative on the MSCC was on vacation in October, 2007, Dr. Day, as Chairman, presented Dr. Tuli. There was nothing untoward in this; in the past, Department chairmen had presented physicians for appointment in the absence of the Department representative. Dr. Day orally presented Dr. Tuli to the committee in much the same way he had in the paperwork, i.e., that she was an excellent surgeon, but that some anger management training might be of benefit for her since her behavior was volatile and her mood could swing from one extreme to another. Dr. Day also apparently reported his understanding that about thirty members of the operating room staff did not want to work with Dr. Tuli. At the end of his presentation, Dr. Day stated that he wanted Dr. Tuli reappointed, but that he recommended that she have some interpersonal training. Dr. Day asserts that he presented Dr. Tuli fairly and honestly to the best of his ability, and that he has never treated her in a discriminatory way, nor had he ever retaliated against her.

The record reflects that there is evidence to support Dr. Day's evaluation. For example, as Residency Director, it is fair to assume that Dr. Day was aware of the allegations by a resident against Dr. Tuli and *vice versa* which ultimately

54

resulted in the HR investigation. Further, there are Dr. Tuli's statements concerning her run-ins with Dr. Day; from his perspective, Dr. Day could well fault the plaintiff's behavior as she faults his. In addition, there was the incident with a nurse and the Neurosurgical Anesthesia staff in the OR in September, the month before she was presented, which gave rise to the sentiment that people did not want to work with her because she was too difficult. There is no evidence that this incident was the result of discrimination.

After discussing Dr. Day's presentation, the committee voted to recommend that Dr. Tuli be reappointed for a four-month period during which she was to be evaluated at PHS consequent to "concerns about issues of interpersonal communications and behavior (including interactions with members of the medical staff, other hospital employees and patients)" and then follow any recommendations made.

Because there was concern about the lack of specificity about events in Dr. Day's presentation, the Chairman of the Credentials Committee asked Dr. Whittemore to present Dr. Tuli before the committee. Dr. Whittemore had served as acting Chairman of the Neurosurgery Department from July, 2006 through July, 2007 and had had fairly regular meetings with Dr. Tuli both before and during that time period. In presenting Dr. Tuli, Dr. Whittemore

discussed those interactions as well as Dr. Tuli's complaints about unfair spine call and complaints about some of the residents and other staff, noting that certain of those complaints had been substantiated in the 2005 HR investigation.

The evidence shows that Dr. Whittemore was aware of the HR finding in its October, 2005 report that "Dr. Tuli's behavior needs to be addressed" and that "[s]ome type of intervention needs to take place to address and mitigate [Dr. Tuli's] behavior." There is no evidence that the HR investigation was in any way tainted by discrimination.[30]

In August, 2006 Dr. Whittemore wrote that Dr. Tuli "continues to have very little insight into her own role in creating her own problems. Her general lack of collaborative spirit...consistently prevents her from developing satisfactory interpersonal relationships, in fact the trend is just the opposite." Dr. Whittemore noted examples of "her difficult nature" to be arguments about sharing microscopes in the OR, calling in staff unnecessarily on weekends and off hours and inappropriate scheduling.

---

[30]

Although the HR Report issued at or about the time of Dr. Tuli's recredentially in October, 2005, it is certainly relevant for the purpose of her 2007 recredentialing with respect to the ongoing nature of some of the problems which developed during the 2005-2007 period.

Dr. Whittemore determined Dr. Tuli to be a clinically adept surgeon who provided superb surgical care in her November 3, 2006 performance report.  At the same time, as set forth in full on pp. 21-22, *supra,* Dr. Whittemore wrote of her insensitivity and her "erratic and abusive behavior" which must "dramatically change within the next few months, otherwise we would need to put into play some form of remediation for her to continue to participate here in the Department."  (#49, Exh. EE)

Evidently, things did improve, and in December, 2006, Dr. Whittemore e-mailed Dr. Tuli with an upbeat report that he had been "getting great feedback regarding your overall demeanor."  Nine months later, however, Dr. Tuli's behavior prompted the head of Neurosurgical Anesthesia to advise Dr. Day that it had become "increasingly difficult for the OR team to work constructively with her."  Dr. Whittemore noted that Dr. Tuli's behavior was "reminiscent" of what it had been before her 2006 annual performance report and was troubling.

After Dr. Whittemore's presentation, the members of the Credentials Committee reconsidered their prior decision regarding Dr. Tuli's reappointment, but ultimately concluded that it had been a correct decision and therefore made

no changes to it.

In arguing that the decision was a pretext for discrimination, Dr. Tuli notes that the Credentials Committee was not aware prior to his presentation that she had a troubled relationship with Dr. Day and had been complaining about his behavior and actions for years. According to the plaintiff she had been subjected to disparate treatment over the years by Dr. Day in that he referred to her as a "girl", he excluded her from meetings or ignored her in them, he questioned her knowledge and authority, but not that of her male colleagues, and he at least tacitly allowed the male residents to shirk their duties with respect to her. Most of these difficulties seem to have occurred from 2004 through mid-2006.

Dr. Tuli argues Dr. Day also had reason to retaliate against her because he blamed her for one of his cases being reported to the Board of Medicine as a major incident. This of course took place three to four years before his presentation to the Credentials Committee. Dr. Tuli contends that after becoming Chairman, Dr. Day was empowered to strike back at her.

The plaintiff notes that Dr. Day had two other discrimination claims filed against him, and that other individuals have filed affidavits attesting to Dr. Day's inappropriate comments to female staff and calling women girls. The

58

defendants have filed competing affidavits wherein minority women physicians have stated that Dr. Day has always treated them professionally and with respect. Dr. Tuli has filed affidavits and accolades supporting her character and her friendliness; the defendants have filed comparable documents with respect to Dr. Day.

After the October meeting, Janet Barnes expressed concern that in her two years on the Credentials Committee, she "had not seen a similar review of the other male surgeons whose behavior could have been characterized similarly." Dr. Tuli argues that the minutes of the Credentials Committee meetings reveal that only a handful of doctors had been referred to PHS and their "issues" were much more serious her behavioral issues. The defendants disagree, and have filed affidavits to the effect that Dr. Tuli is not unique and that other doctors had been referred to PHS for issues similar to, or of less consequence than, those of the plaintiff.

Janet Barnes further testified that Dr. Whittemore did not make a complete presentation because he never advised the committee of Dr. Tuli's complaints about Dr. Day. It is argued that he allowed the discrimination by Dr. Day to continue unabated when he should have taken steps to remedy it. One member of the Credentials Committee has stated that that would have been

important information for the committee to know.  However, Janet Barnes and Dr. Coblyn, the Chairman of the Credentials Committee, were aware that Dr. Tuli had complained about Dr. Day at least prior to Dr. Whittemore's presentation.  Moreover, although Dr. Tuli had several conversations about the Credentials Committee's deliberations with Dr. Frerichs after the October meeting, but before the one in December, Dr. Frerichs does not remember her ever telling him that she had formally complained about Dr. Day or that the Credentials Committee should be told about it.

Dr. Tuli argues that the credentialing process at BWH is discriminatory because there are no standards by which a physician's behavior or conduct is judged.  From her perspective, "the standard that the [Credentials Committee] applied appeared to be 'go along with what the Chairman wants.'" (#33 at 31)  In this case, however, the Credentials Committee did not simply rely on Dr. Day's presentation.  The Credentials Committee received further input from Dr. Whittemore, and reconsidered their initial determination in light of his additional presentation.

Dr. Tuli also contends that the credentialing process is flawed because she was supposed to be presented as a Category 2 candidate due to the eight or ten complaints filed against her, but that the recommendation that she go to PHS

was premised on Dr. Day's presentation about her behavior and interpersonal difficulties. First, there is evidence from Janet Barnes that both considerations factored into the Credentials Committee's decision. Further, Dr. Day completed the assessment forms sent to him by the Provider Services department, detailing the same issues that he ultimately presented to the Credentials Committee. Specifically, on the form entitled Medical Staff Credentialing Committee Category 2 Appointment, with respect to the "[e]valuation of Category 2 issue and basis for recommendation", Dr. Day wrote "consider further training in communication skills...how to deal with others to get group dynamics to work positively." It is fair to presume that the Credentials Committee would have had those assessment forms completed by Dr. Day as part of the credentialing process. Consequently, even if the plaintiff had been presented by the Neurological Representative to the Credentials Committee instead of Dr. Day, the Credentials Committee would have had Dr. Day's assessment of Dr. Tuli as information to consider in making their determination.

Lastly, Dr. Coblyn and Janet Barnes, Dr. Tuli's friend, both testified that the process with respect to Dr. Tuli and the outcome were fair.

The plaintiff has presented evidence that could be viewed as casting doubt on the defendants' explanations for their actions. That, however, is not enough.

Dr. Tuli has not proffered "'evidence...of such strength and quality as to permit a reasonable finding that....[the reasons for the Credentials Committee's decision] were *obviously or manifestly unsupported*.'" Ruiz, 124 F.3d at 248 (citation omitted)(emphasis in original).

On the contrary, there is too much evidence which supports the Credentials Committee decision which is not alleged (much less proven) to be the result of, or infected by, any discrimination for the Court to find that it is likely that the plaintiff will succeed at trial in proving that BWH's asserted reasons for requiring Dr. Tuli to interface with PHS was pretextual.[31]

### 5. Likelihood of Success on the Retaliation Claim

The evidence as discussed above is equally applicable on the retaliation claim. Assuming, *arguendo,* that Dr. Tuli has established a *prima facie* case of retaliation, the defendants have articulated legitimate reasons for the decision of the Credentials Committee. On the basis of the evidence submitted, the plaintiff is not likely to succeed in proving that the asserted reasons were a

---

[31] For much the same reasons, if Dr. Tuli is making a *Price Waterhouse* claim, even assuming, *arguendo,* that she has shown that her gender played a motivating part in the decision to require her to go to PHS, based on the evidence on the issue which was not affected by any gender bias or discrimination, i.e., patient, staff complaints, etc.,  the Court finds that the defendants are likely to succeed in proving by a preponderance of the evidence that the Credentials Committee would have made the same decision even if it had not taken plaintiff's gender or membership in a protected class into account.

pretext for discrimination.

Further, regarding the retaliation claim with respect to Dr. Day, the plaintiff has failed to prove that she is likely to succeed in proving the third element, i.e., the causal connection between her protected activity and Dr. Day's presentation to the Credentials Committee.  The state of the evidence is that after Dr. Tuli complained to Dr. Whittemore in April, 2006 about various alleged acts of discrimination by Dr. Day, the plaintiff's attorney wrote a letter dated June 16, 2006 requesting that Dr. Tuli's "grievance and any formal investigation" be held in abeyance.  Again in August of 2006, although continuing to complain to Dr. Whittemore about Dr. Day, Dr. Tuli would not allow Dr. Whittemore to confront Dr. Day with her allegations such that Dr. Whittemore felt "handcuffed."[32]  Dr. Whittemore has attested that, pursuant to Dr. Tuli's request, the Hospital never brought the plaintiff's allegations to Dr. Day's attention up to the date that she commenced legal action.

The only evidence proffered to contradict the defendants' evidence is Dr. Tuli's statement that "In September, 2007, Dr. Deepa Soni filed a rebuttal to BWH's Position Statement at the MCAD.  I was not aware of its contents, but

---

[32] The plaintiff argues that BWH's failure to take action on her continued complaints is evidence of discrimination.

subsequently learned that Dr. Soni's filing stated 'Dr. Soni also publicly supported an Indian female attending neurosurgeon, Dr. Sagun Tuli, in her claims of race and gender discrimination against BWH.'" (#36 ¶71) However, this statement does not describe any discrimination claims against Dr. Day individually, and Dr. Day specifically denies even having received a copy of this rebuttal. (#49, Exh. D ¶13)

If Dr. Day had no knowledge of Dr. Tuli's protected activity prior to the time he made his presentation to the Credentials Committee in October, 2007, the requisite causal connection cannot be shown.

## B.  Irreparable Harm

The Credentials Committee has not revoked Dr. Tuli's credentials. Rather, the vote was that she be re-credentialed as a Category 1 candidate so long as she reports to PHS for evaluation and follows the recommendations, if any, that are made.  From all that appears, the Credentials Committee requires that Dr. Tuli sign a release to the extent PHS may advise Drs. Whittemore and Coblyn as well as Joan Stoddard of the legal department that the plaintiff has gone to PHS and that she is complying with the recommendations made, if any. Contrary to the plaintiff's contention, there is no basis for finding that "all of the

committee members will know of [her] 'treatment' at PHS"[33] beyond the fact the

she was to contact PHS for an evaluation.  All other information remains

confidential.[34]

Further, the fact that the person Dr. Tuli is to contact at PHS, the director,

is a psychiatrist does not establish that the evaluation is psychiatric in nature -

the nature of the evaluation itself is confidential.[35]  It is to be noted, moreover,

that in her contract of employment, Dr. Tuli agreed "to undergo a mental or

physical examination...during the term of [her] appointment to determine

whether [she] is able to perform the essential functions of the position."  This

is in accord with Massachusetts Code of Regulations 3.05(j) mandating that

BWH require a licensee to undergo a physical or mental examination if

requested by the Credentials Committee.

A referral to PHS is not an event reportable to the Board of Registration

---

[33]

Of course the members of the Credentials Committee "know" that she would be going to PHS because they are the ones who voted to make that a condition of her credentialing.  Moreover, according to Dr. Coblyn's letter, the Board of Trustees already "know" since they have approved the recommendation.

[34]

That the Credentials Committee's recommendation is now public knowledge is a result of the plaintiff's actions, not those of the defendants.

[35]

It is premature to find irreparable harm premised on any potential recommendation that PHS might make for the simple reason that is a future event and, at the end of the day, no recommendations might be forthcoming.

in Medicine. It does not impact or restrict Dr. Tuli's right to practice medicine.
Drs. Whittemore and Coblyn, as well as Janet Barnes, all attest that a referral
to PHS is not a disciplinary action. The Commonwealth of Massachusetts Board
of Registration in Medicine, Policy 01-01, expresses the same position.

Dr. Tuli contends "state medical board forms, malpractice insurance forms
and health insurance forms" all define disciplinary action "so broadly" that if
she goes to PHS she will be required to state that she has been subjected to
disciplinary action on these forms which in turn will implicate her ability to
obtain insurance and to practice medicine. The plaintiff has not submitted any
of these forms for review; at best she has offered her opinion of how a referral
to PHS would be treated under the definitions in these forms. Her contention
is unsupported by evidence.

The plaintiff argues that her reputation will be damaged by the
requirement that she report to PHS for an evaluation.[36] Any such damage to
reputation, if proven, is compensable by a monetary award. *See, e.g., Memphis
Community School District v. Stachura,* 477 U.S. 299, 307 (1986); *Schrier v.*

---

[36]

    The statement by plaintiff's expert that "[t]he possibility that Dr. Tuli's privileges might be limited, suspended or revoked by referral to Physician Health Services would cause potentially irreparable harm to her professional reputation" (Declaration of Paul B. Hofmann, Dr.P.H., FACHE #61 §6)is equivocal and conclusory.

*University of Colorado*, 427 F.3d 1253, 1266-1267 (10 Cir., 2005)*; Gately v.*

*Commonwealth of Massachusetts*, 2 F.3d 1221, 1232-1234 (1 Cir., 1993), *cert.*

*denied,* 511 U.S. 1082 (1994) ; *Shady v. Tyson*, 5 F. Supp.2d 102, 109 (E.D.N.Y.,

1998)("With respect to the plaintiff [doctor's] employment opportunities and

professional reputation, absent 'extraordinary circumstances,' irreparable harm

is not established by loss of income or position, or the inability to find other

employment. *See Holt v. Continental Group, Inc.,* 708 F.2d 87, 90-91 (2d

Cir.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1294, 79 L.Ed.2d 695

(1984)").

The cases upon which Dr. Tuli relies to show irreparable harm are

inapposite because they deal with situations where a doctor's privileges have

been revoked or a report has been made to the National Practitioner Data Bank.

*See Ulrich v. City and County of San Francisco*, 308 F.3d 968, 973 (9 Cir., 2002);

*Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324, 1327 (10 Cir., 1996),

*cert. denied sub nom. Miller v. Brown,* 520 U.S. 1181 (1997). In *Carlini v.*

*Highmark*, 756 A.2d 1182, 1188 (Pa. Comm. Ct., 2000), *appeal denied,* 725

A.2d 809 (Pa., 2001), the doctor proffered statistical evidence to show the

impact on his practice, but because the "potential business loss cannot be

reasonably measured" a legal remedy was inadequate.  No evidence of this type has been presented by Dr. Tuli.

The plaintiff's additional cases are also distinguishable.  For example, in *Vazquez v. Wendy's*, 931 So.2d 152 (Fla. App. 1 Dist., 2006), the plaintiff cites to the dissent for support.  The petition for writ of certiorari was denied because "the petitioner has failed to demonstrate that the functional capacity evaluation will result in irreparable harm." *Vazquez*, 931 So.2d at 152.  The case of *Gasparino v. Murphy*, 352 So.2d 933, 934-935 (Fla. 2nd DCA, 1977) presents an entirely different scenario wherein the respondent had moved for a compulsory mental examination on the petitioner under the Florida Rules of Civil Procedure 1.360(a).  The Court determined that the petitioner's mental state had not been put "in controversy" nor had the respondent demonstrated "good cause". *Gasparino*, 352 So.2d at 935.  As a consequence, "no basis has been demonstrated for the invasion of petitioner's right of privacy...[t]hus we hold that the discovery sought might cause irreparable harm to the petitioner." *Gasparino*, 352 So.2d at 936.

While the decision in *Appel v. Spiridon*, 463 F. Supp.2d 255 (D. Conn., 2006) is closer to the mark, it is yet nonetheless different.  In that case the

plaintiff, a university professor, moved for preliminary injunctive relief to restrain her employer from requiring that she undergo a mental health examination. *Appel*, 463 F. Supp.2d at 266.   The Court found that "the defendants have not shown that the medical examination that they have required is related to Appel's job functions and would be 'no broader or more intrusive than necessary.'" *Appel*, 463 F. Supp.2d at 266 (citation omitted). Further, "[n]o other faculty member had been subjected to an involuntary psychiatric examination." *Appel*, 463 F. Supp.2d at 266.   In contrast, the evaluation required in the instant case is directly related to Dr. Tuli's job functions and the evidence shows that other physicians have been referred to PHS for evaluation.

To summarize, based on the current record, the Court finds that Dr. Tuli has failed to demonstrate that she will suffer irreparable harm if the injunction does not issue.

### C.  Balance of Hardships

Submitting to an evaluation and signing even a limited release with respect to medical information are, indeed, personally intrusive and a hardship. However, Dr. Tuli does not dispute that if the Credentials Committee's

69

recommendation is ultimately determined to be untainted by unlawful discrimination or retaliation, the Credentials Committee is fully empowered to render such a decision and the Hospital, by regulation, must require the physician to undergo the mental or physical examination requested. (*see* #33 at 29 ("Dr. Tuli does not contest that a physician's demeanor and interactions can be the subject of review.")) Such a circumstance was contemplated in her contract for employment where Dr. Tuli agreed to undergo the mental or physical examination at any time during her tenure. Having been unsuccessful in proving that she is likely to succeed on her claim that the Credentials Committee's decision is marred by unlawful conduct, the hardship on the plaintiff is significantly decreased.

On the defendants' side, Dr. Whittemore attests that BWH's "ability to confirm the appropriate behavior and health of the medical professionals who are providing care at the BWH is critical to its ability to assure optimal patient care and is required by state and federal regulation." (#49, Exh. C ¶47) The impact of an injunction on the credentialing process at the hospital would plainly be a hardship.

In weighing the relevant impositions, the balance tips in favor of the

defendants.

D. Effect on Public Interest

For the same reasons as the third factor, this final consideration favors the defendants.   The public has an interest in being treated in hospitals by physicians who are themselves healthy and behave with an appropriate demeanor.   Further, it is in the public interest to enforce the law, i.e., the regulation requiring that BWH repeat the mandated credentialing requirements every two years and the regulation stating that BWH must follow the request of the Credentials Committee and require Dr. Tuli to undergo an evaluation at PHS.

### *V.   Recommendation*

For the reasons stated, I RECOMMEND that Plaintiff, Sagun Tuli, M.D.'s, Motion For Preliminary Relief (#32) be DENIED.

### *VI.  Review by the District Judge*

The parties are hereby advised that any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within seven (7) days of the party's receipt of this Report and Recommendation.   *See* footnote 1, *supra*.   The written objections must

71

specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.  *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


/s/ Robert B. Collings
ROBERT B. COLLINGS
United States Magistrate Judge

May 1, 2008.