UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SAGUN TULI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION NO. 1:07-CV-12338 |
| | ) |
| BRIGHAM & WOMEN'S HOSPITAL, INC. | ) |
| AND ARTHUR DAY, M.D., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT, BRIGHAM & WOMEN'S HOSPITAL'S, MEMORANDUM IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The defendant, Brigham and Women's Hospital, is entitled to summary judgment as numerous of the plaintiff's claims are time-barred by the relevant statute of limitations. Also, as further set out herein, the plaintiff has failed to produce sufficient evidence to support her prima facie claims of discrimination, retaliation and violation of the Massachusetts healthcare whistleblower act. Therefore, the defendant, Brigham and Women's Hospital, is entitled to summary judgment on these claims.[1]

The plaintiff, Sagun Tuli, M.D. (hereinafter referred to as "Dr. Tuli" or "plaintiff"), seeks declaratory relief and compensation in this action for alleged violations of her federal and state rights, by the defendant, Brigham & Women's Hospital (hereinafter referred to as "BWH" or the "defendant") and Dr. Arthur Day (hereinafter "Dr. Day").[2] The defendant disputes plaintiff's

---

[1] To the extent that the plaintiff is making vicarious liability claims against BWH, which have not been specifically pled in her complaint, BWH also moves for summary judgment as to Dr. Day and anticipates his joinder in this motion.

[2] Dr. Tuli only brings claims against Dr. Day and BWH. While her Complaint discusses treatment by other physicians within the BWH Neurosurgery Department, it is unclear whether the plaintiff claims direct liability by BWH, or simply that BWH is vicariously liable for Dr. Day's alleged acts.

assertion of such violations, and, pursuant to Fed. R. Civ. P. 56 now moves for summary judgment on these claims.

## PROCEDURAL HISTORY

1.  On December 4, 2007, Dr. Tuli filed a Complaint against Dr. Day and BWH with the Massachusetts Commission Against Discrimination ("MCAD"). On December 20, 2007, after removing her Complaint from the MCAD, plaintiff filed this present action. The defendants filed their Answers on January 10, 2008.

2.  On March 21, 2007, plaintiff filed a Motion for Injunctive Relief. The defendants filed their Opposition on April 4, 2008.

3.  On May 1, 2008, Magistrate Judge Collings issued a Report, recommending that the Court deny plaintiff's motion.

4.  Judge Nancy Gertner subsequently held a hearing regarding the Magistrate's Report and on June 30, 2008, she granted the plaintiff's motion for preliminary injunction.

5.  On July 30, 2008, the defendant BWH filed a Notice of Appeal, which is pending before the First Circuit Court of Appeals.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  On March 6, 2002, Dr. Tuli was hired as an associate surgeon in the Department of Neurosurgery at BWH with an appointment at Harvard Medical School ("HMS") at the level of Instructor. Dr. Tuli signed a contract of employment with BWH covering a two-year period with a salary of $180,000.00 per year. (See Exhibit A, Tuli-BWH employment Contract/Agreement).

2.  At the time she signed her employment contract with BWH, Dr. Peter Black ("Dr.

Black") was the Chairman of BWH's Department of Neurosurgery.[3]    (See Exhibit B, Affidavit of Anthony Whittemore, M.D.).

3.    From the time of Dr. Tuli's hiring in 2002 until June 30, 2006, Dr. Black was the Department Chair.  (See Exhibit B, ¶¶ 5, 29; Exhibit C, Affidavit of Dr. Arthur Day, ¶ 6).

4.    In 2002, Dr. Arthur Day ("Dr. Day") joined the BWH Department of Neurosurgery as the Director of its Residency Program and Vice Chair of the Neurosurgery Department.  (See Exhibit C, ¶ 4).

5.    On July 1, 2007, Dr. Day was appointed Chair of BWH's Department of Neurosurgery. (See Exhibit C, ¶ 9).

6.    Prior to July 1, 2007, Dr. Day was not Dr. Tuli's immediate supervisor and did not have the ability to promote Dr. Tuli, or the ability to increase her compensation.  (See Exhibit B, ¶¶ 5, 29; Exhibit C, ¶¶ 6-8).

7.    In 2004, Dr. Tuli's spine colleagues in the Neurosurgery Department, Dr. Eric Woodard and Dr. Mark Eichler, left BWH.  (See Exhibit D, Deposition of Dr. Tuli Vol. 1, pp. 161).

8.    On April 1, 2005, Dr. Tuli was promoted to the level of Assistant Professor.  (See Exhibit D, Deposition of Dr. Tuli Vol. 1., pp. 89-91).

9.    By this time, Dr. Tuli had also been named the Neurosurgery Representative to the QARM Committee and the Neurosurgery Professionalism Officer by Dr. Black.  (See Exhibit D, Deposition of Dr. Tuli Vol. 1, pp. 90-91; Exhibit B, ¶ 6).

10.   By 2006, Dr. Tuli's salary had increased by some ███████ to a base level of ███████.

---

[3] Dr. Black is not a defendant in this lawsuit and he stepped down from his role as Chair of the Department of Neurosurgery in June 2006.  No legal claims were ever brought against him by Dr. Tuli, and the applicable Statute of Limitations has long since run in this regard.

(<u>See</u> Exhibit B; <u>see also</u> Exhibit E, Affidavit of Jeffrey J. Pike)

11.  As of June 30, 2006, Dr. Black stepped down as Chair of the Department.  Dr. Anthony Whittemore, Chief Medical Officer of the Hospital, and Dr. Michael Zinner, the Hospital's Chief of Surgery, together took responsibility for the Department as the Members of the Interim Executive Council of the Department of Neurosurgery. Dr. Whittemore acted as de-facto Interim Chair of the Department of Neurosurgery during this time period.  (Exhibit B).

12.  On November 3, 2006, Dr. Whittemore met with Dr. Tuli for her annual review.  (<u>See</u> Exhibit F, November 3, 2006 office note by Dr. Whittemore; <u>see also</u> Exhibit B, ¶ 33).

13.  At this review, Dr. Whittemore notified Dr. Tuli that BWH would retroactively pay her an additional ▮▮▮▮ per month for the additional spine call she had taken in 2005 and 2006 (to be paid as a lump sum bonus of ▮▮▮▮), in addition to an earned bonus for work performed.  (<u>See</u> Exhibit B, ¶ 34 & Exhibit F).  Dr. Whittemore also increased Dr. Tuli's base salary to ▮▮▮▮ at that time.  (<u>See</u> Exhibit B, ¶ 35).

14.  With the additional compensation, Dr. Tuli's total compensation for 2006 was in excess of ▮▮▮▮.  (<u>See</u> Exhibit B, ¶ 35 & Exhibit E, ¶ 7).

15.  Since 2004, when Drs. Woodward and Eichler left BWH, the Spine Division consisted of only one spine surgeon – Dr. Tuli – until the hiring of a junior neurosurgeon in 2008. (<u>See</u> Exhibit U, Deposition of Dr. Peter Black, p. 191).

16.  Dr. Tuli has acknowledged that she has never submitted a formal research proposal to anyone at BWH, including Dr. Day, and that her efforts to obtain outside funding, while supported by the BWH, have been turned down.. (<u>See</u> Exhibit D, pp. 27-28, 33-36, 39-45).  The plaintiff herself has acknowledged that she understands such a proposal to be a

prerequisite to this process. (Exhibit D, p. 26)

**Dr. Tuli's Discussions with Dr. Whittemore and others:**

17.  ███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████  (<u>See</u> Exhibit T,

Deposition of Janet Barnes, pp. 50-53).

18.  Between December 2005 and November 2006, Dr. Tuli met with Dr. Whittemore to discuss numerous complaints concerning allegations of excessive spine call, lack of promotion, discrimination and unfair compensation.  (<u>See</u> Exhibit F).

19.  Throughout his meetings with the plaintiff, Dr. Whittemore repeatedly advised Dr. Tuli to bring any complaints of discrimination to BWH's Human Resources Department.  Dr. Tuli did not do so.   (<u>See</u> Exhibit F).

20.   In the fall of 2005, the BWH initiated a review of the Department of Neurosurgery, conducted by the Human Resources Department.  (Exhibit B, ¶9)

21.  On April 7, 2006, Dr. Tuli presented a letter to Drs. Whittemore and Gottlieb alleging "sex discrimination, national origin discrimination, a hostile work environment and retaliatory threats", "outrageous sexist comments, racist remarks, religious remarks, pay and promotion disparities and now false defamation of me, my character and my competence.  (<u>See</u> Exhibit G, April 7, 2006 letter)

22.  On April 10, 2006, Dr. Whittemore responded by e-mail to Dr. Tuli, noting in relevant part that "the allegations are intolerable and we need to address them with and for you and for the institution.  I have been in contact with Joan Stoddard as we discussed and it is our opinion that we share your concerns with Lisa Pontin and Eileen Burke from HR in

an effort to outline the best course of action and to assure your protection in the process."

(See Exhibit H, E-mail by Dr. Whittemore, April 10, 2006)

23.     On April 12, 2006, Dr. Tuli notified Dr. Whittemore via e-mail that she had retained Attorney Elizabeth Rogers to represent her and to work with "Hospital Counsel to further our joint interests of eliminating discrimination and allowing me to work unencumbered by attacks, falsehoods and blatant inequality."  (See Exhibit I, April 12, 2006 e-mail from Dr. Tuli to Dr. Whittemore).

24.      On June 16, 2006, Dr. Tuli's attorney[4] requested that BWH not pursue Dr. Tuli's allegations of discrimination at that time.  Ms. Zucker's letter specifically acknowledged that "Dr. Tuli's agreement to hold her grievance in abeyance is not a waiver of the concerns she has expressed nor does it signal a lack of commitment to stand behind them if necessary; on the other hand your agreement not to initiate further investigation of Dr. Tuli's complaint is at our request and shall not be construed as an act of delay or inaction on your client's part." (See Exhibit J, Letter from Attorney Zucker).  BWH, through its counsel, complied with this request. (See Exhibit B, ¶ 27).

**Dr. Tuli's Presentation Before the BWH Credentialing Committee (MSCC):**

25.     On August 28, 2007, Dr. Day received a letter from Mary Beth Mann, Credentialing Administrator for BWH Provider Services, notifying him that:



---

[4] At that time, Attorney Ellen Zucker, not Elizabeth Rodgers, was representing Dr. Tuli.

(<u>See</u> Exhibit K, Letter from Mary Beth Mann (BWH Provider Services) to Dr. Day).

26. 

(<u>See</u> Exhibit L, Tuli 2002/2003/2005 presentations before the MSCC; <u>see</u> <u>also</u> Exhibit K).

27.

(<u>See</u> Exhibit K).

28.

. (<u>See</u> Exhibit M, September 21, 2007 e-mail from J. Hastings).

29. In 2007, Dr. Day had been notified that Dr. Tuli would be re-credentialed by the MSCC via letter from Mary Beth Mann, of BWH Provider Services, dated August 28, 2007. (<u>See</u> Exhibit K).

30. _____ for Dr. Tuli was made prior to Dr. Day providing the Medical Staff Credentialing Committee ("MSCC") with his personal recommendation of Dr. Tuli's reappointment.  (<u>See</u> Exhibit K; Exhibit N, Affidavits of Mary Beth Mann and Joanne Hastings).

31. Prior to the Committee's meeting, Dr. Day submitted recommendations to the MSCC. (<u>See</u> Exhibit O, Deposition of Dr. Day Vol. 2., p. 291).

32.  ████████████████████████████████████████████████████████

████████████████████ (<u>See</u> Exhibit P, MSCC paperwork from 2007).

33.  On October 8, 2007, Dr. Tuli was presented before the MSCC by Dr. Day █████████

█  <u>See</u> Plaintiff's Complaint.

34.  ████████████████████████████████████████████████████████

████████████████████████████████████ (See Exhibit Q attached,

2007 Minutes of the MSCC; Exhibit R, Affidavit of Jonathan Coblyn, M.D., ¶ 7).

35.  ████████████████████████████████████████████████████████

███████████████████ (See Exhibit R, ¶ 16).

36.  A referral to PHS is not a disciplinary action and it is not required that PHS evaluation be

reported to the Board of Registration in Medicine.  (<u>See</u> Exhibit R, ¶ 17; <u>see also</u> Exhibit

S, Board of Registration in Medicine Policy 01-01 & PHS form).

37.  The completion of a PHS evaluation does not restrict a physician's privileges or right to

practice medicine.  (See Exhibit R, ¶ 18).

38.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████.  (See

Exhibit R, ¶ 8).

39.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████.  (See Exhibit R, ¶ 11).

40.  Dr. Whittemore presented on Dr. Tuli's case at the next regularly scheduled MSCC

meeting.  (See Exhibit B, ¶ 43 & Exhibit R, ¶ 12).

41. ████████████████████████████████████████████████████
████████████████████████████████████████████████. (See
Exhibit R, ¶¶ 13-14).

42. After the MSCC issued its decision, Dr. Tuli approached Dr. Coblyn to express her
dissatisfaction with the decision.  (See Exhibit R, ¶19).

43. During meetings with Dr. Tuli, Dr. Coblyn and Janet Barnes advised the plaintiff to
complete the PHS evaluation.   (See Exhibit R, ¶19; see also Exhibit T, Deposition
Testimony of Janet Barnes, pp. 169-170).

44. Both Dr. Coblyn and Ms. Barnes told Dr. Tuli that the PHS process was not onerous and
could serve as a means to resolve concerns about her behavior.   Id.

45. Dr. Tuli notified Dr. Coblyn and Ms. Barnes that she did not wish to attend to PHS. (See
Exhibit R, ¶19).

## ARGUMENT

## I.    STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
of law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995), cert denied,
516 U.S. 1113 (1996); Fed.R.Civ.P. 56(c).  "When a party fails to make a showing sufficient to
establish the existence of an element essential to that party's case, and on which that party bears
the burden of proof at trial, there can no longer be a genuine issue as to any material fact … and
the moving party is entitled to judgment as a matter of law."  Smith v. Stratus Computer, Inc., 40
F.3d 11, 12 (1st Cir. 1994).  Crucial to the Court's undertaking in this analysis is a determination

of (1) whether factual disputes exist; (2) whether the factual disputes are genuine; and (3) whether any fact genuinely in dispute is material.  Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986).

A "genuine" issue means that "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side."  National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert denied, 515 U.S. 1103 (1995); Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981).  "'Material' means that a contested issue of fact has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant."  Smith v. F.W. Morse & Company, Inc., 76 F.3d 413, 428 (1st Cir. 1996).

Once a moving party makes a showing as to the "absence of evidence to support the nonmoving party's case," the burden of production shifts to the non-movant.  Dow v. United Brotherhood of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993) (citation omitted).  To prevail on summary judgment, the non-movant must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  He or she cannot rely on an absence of competent evidence.  McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).

## II.    DR. TULI'S CLAIMS AGAINST DR. DAY AND BWH FOR ALLEGED BEHAVIOR OCCURRING PRIOR TO FEBRUARY 7, 2007 ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.

Discrimination claims under 42 U.S.C. § 1981 and Mass. Gen. Law ch. 151B must be administratively pursued prior to the filing of a lawsuit.  See Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277-78 (1st Cir. 1999).  A state plaintiff must file an administrative charge with the MCAD "within 300 days of the occurrence of the alleged harassing or discriminatory

event or events."  Mass. Gen. Laws ch. 151B, § 5.  The period begins to run at the time of the "act of discrimination."    Ocean Spray Cranberries v. Massachusetts Comm'n Against Discrimination, 441 Mass. 632, 641 (2004).  "[A] Title VII plaintiff must file a charge with the EEOC within 300 days 'after the alleged unlawful employment practice occurred.'"  Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting 42 U.S.C. § 2000e-5(e)).

Federal law differentiates between a discrete retaliatory or discriminatory act, which occurs "for purposes of the statute of limitations on the day that it 'happened,'" and hostile work environment claims, which "do not 'turn on single acts but on an aggregation of hostile acts extending over a period of time.'"  Compare Id., quoting National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002)), with Id., quoting Havercombe v. Dep't of Educ., 250 F.3d 1, 6 (1st Cir. 2001)).

Here, Dr. Tuli is alleging that, based on discriminatory motives related to her gender or national origin, BWH failed to promote her or increase her salary.  Consequently, she was required to file a charge within 300 days of the date of the discriminatory act evidencing that failure.  Id., citing Morgan, 536 U.S. at 115.  Dr. Tuli's discrimination claims against BWH should be dismissed because she failed to file her claim within the statutory 300 day period.

A.    **All Of Plaintiff's Claims For Incidents Allegedly Occurring Prior To February 7, 2007 Are Time Barred.**

Under both federal and state law, Dr. Tuli was required to file her complaint with the MCAD or EEOC within 300 days after the alleged unlawful employment practice.  However, Dr. Tuli did not file her MCAD complaint until December 4, 2007 – some **three years** after she alleges that the discrimination started.  Per the applicable statutes, only alleged discrimination occurring 300 days prior to the plaintiff's MCAD filing date is actionable.  Therefore, to the extent that Dr. Tuli alleges that discrimination occurred prior to February 7, 2007, her claims are

barred by the statute of limitations in their entirety.   See Marrero, 304 F.3d at 18; Ocean Spray Cranberries, 441 Mass. at 641.

Furthermore, specific to her claims against BWH, Dr. Tuli does not assert any specific allegations of discrimination by BWH after February 2007.  See Plaintiff's Complaint.  Instead, she makes vague allegations against the defendant, implying that BWH is somehow liable because it allegedly condoned Dr. Day's discrimination.  See Plaintiff's Complaint.[5]   The plaintiff does **not** assert, nor has she produced evidence, that she was the only spine surgeon at BWH because of discrimination by the Hospital based on her gender or national origin.  Nor does Dr. Tuli make any assertions that BWH discriminated against her after February 2007 when making promotion or compensation decisions.   Indeed, plaintiff was promoted to Assistant Professor in 2005 and her salary was increased by ███████ in November 2005 and by ███████ in November 2006.  (See Exhibits B & E).  Because plaintiff does not assert that BWH made its employment decisions based on her national origin and/or gender from 2007 onward, there is no actionable claim pending against this defendant on the basis of discrimination.

**B.      Plaintiff's Claims Do Not Constitute A Continuing Violation Because Events Occurring Before February 7, 2007 Triggered Dr. Tuli's Duty To File with the MCAD or EEOC.**

Assuming that Dr. Tuli will argue that the 300 day filing requirement does not apply here by alleging that defendants' actions before February 7, 2007 establish a pattern of continuing violation, such a claim also fails as a matter of law.   In order to establish the existence of a continuing violation, a plaintiff must prove that (1) at least one unlawful act occurred within the statutory limitations period; (2) the alleged timely discriminatory act has a substantial relationship to the untimely acts; and (3) earlier violations did not trigger the complainant's

awareness and duty to assert her rights in a timely fashion.  See Ocean Spray Cranberries v. Massachusetts Comm'n Against Discrimination, 441 Mass. 632, 643 (2004); Ingram v. Brink's Inc., 414 F.3d 222, 230 n.9 (1st Cir. 2005); Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 612 (1st Cir. 2000) ("[W]here a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that [s]he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place.").  Even assuming Dr. Tuli could maintain prongs (1) and (2), there is no conceivable way that the evidence can be construed to support a claim that Dr. Tuli was not aware of her legal duties.[6]

"[A] plaintiff who demonstrates a pattern of sexual [discrimination] ... that includes conduct within the six-month statute of limitations, may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period, unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve."  Id. at 539.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116-117 (2002); Beaupre v. Cliff Smith & Assocs., 50 Mass.App.Ct. 480, 490 (2000); Morrison v. Northern Essex Community College, 56 Mass.App.Ct. 784, 792-798 (2002).  When there is undisputed evidence of acts that may be found to manifest gender discrimination, and those acts have characteristics in common with acts committed within the limitations period, it becomes a question of law for the judge whether the earlier acts may be considered by the jury on the basis of the continuing violation doctrine.  See, e.g., Beaupre v. Cliff Smith Assocs., 50 Mass.App.Ct. at 490; see also,  Saenger Org., Inc. v. Nationwide Ins.

---

[5] For instance, while Dr. Tuli asserts that she has carried a heavier caseload at the Hospital than her colleagues throughout 2007 and 2008, she herself admits that this is the case because she is the "sole spine neurosurgeon at BWH."  See Plaintiff's Complaint, ¶ 43.
[6] See Exhibit K, April 7, 2006 Letter by Dr. Tuli to Dr. Whittemore.

Licensing Assocs., Inc., 119 F.3d 55, 65 (1st Cir.1997).

Taking the allegations as plead in plaintiff's Complaint on their face, Dr. Tuli clearly knew or should have known that she was being discriminated against more than 300 days prior to filing her Charge with the MCAD.

**1.    Dr. Tuli's limitations period for filing with the MCAD and EEOC began as early as when she retained counsel, in April 2006.**

The evidence clearly establishes that Dr. Tuli retained counsel and considered filing a complaint against BWH and Dr. Day as early as April 2006 – **over a year and a half before she actually filed her MCAD complaint**.  On April 7, 2006, Dr. Tuli sent a long and very detailed complaint to Drs. Whittemore and Gottlieb alleging "sex discrimination, national origin discrimination, a hostile work environment and retaliatory threats", "outrageous sexist comments, racist remarks, religious remarks, pay and promotion disparities and now false defamation of me, my character and my competence."  (See Exhibit G).  A few days later, on April 12, 2006, Dr. Tuli e-mailed Dr. Whittemore, notifying him that Attorney Elizabeth Rogers had been retained to represent her and to work with "Hospital Counsel to further our joint interests of eliminating discrimination and allowing me to work unencumbered by attacks, falsehoods and blatant inequality."  (See Exhibits B & I).  It is beyond dispute that in April 2006, Dr. Tuli considered filing a complaint of gender and national origin discrimination - a clear indication that she had an "awareness and duty" to assert her claim well before the February 2007 date on which the six-month period began to run.

Even if Dr. Tuli did not have actual knowledge, constructive knowledge of the limitations period is "attributed" to an employee in situations where she has retained an attorney.  See e.g., Kale v. Combined Ins. Co. of America, 861 F.2d 746, 753 (1st Cir. 1988).

Given the above, Dr. Tuli failed to timely file her Charge of Discrimination with the

MCAD and thus, all alleged incidents of discrimination dated prior to February 7, 2007 are barred by the statute of limitations and do not constitute discrimination.[7]

## III.  DR. TULI HAS NO REASONABLE EXPECTATION OF PROVING HER DISCRIMINATION CLAIM AGAINST BWH.

Summary judgment is also appropriate on plaintiff's discrimination claims because Dr. Tuli has no reasonable expectation of establishing a prima facie case of discrimination. As this Court has held that a mixed motive approach is applicable to the instant claim of discrimination, we now apply the Price Waterhouse mixed motive theory to the facts in this case. See Memorandum and Order re: Motion for Injunctive Relief, document No. 95, p. 40.[8] Even if the court finds that the applicable statute of limitations does not apply to bar claims arising before February 2007, taking the evidence in the light most favorable to Dr. Tuli, plaintiff has no reasonable expectation of establishing a prima facie case under this theory of liability.

### A.  Under the Price Waterhouse "Mixed Motive" Theory of Liability, Dr. Tuli Cannot Prove that Her Gender or Race Played Motivating Part in BWH's Employment Decisions.

In order to set out a prima facie case for discrimination under a mixed motive framework of liability, Dr. Tuli must prove that discrimination motivated BWH's employment decisions after February 2007 (i.e., the decision not to name Dr. Tuli the Director of the Spine Division or provide additional compensation via research opportunities), even if discrimination was not the sole reason in that decision. See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). As discussed in the Court's decision, if the plaintiff proves that discrimination was a motivating

---

[7] Plaintiff has not pled claims for hostile work environment; therefore, the holding in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) relating to continuing violations related to a hostile work environment claim does not apply to this matter. Even if the Court does not agree, the plaintiff's willingness to discharge her attorney and acceptance of remedial measures indicates a break in the chain of alleged discrimination by the Hospital. (Exhibit U)

[8] The Defendant has objected to the Court's ruling and asserts that plaintiff's failure to assert a mixed motive claim before this Court amounts to a waiver of that claim. See, e.g., Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 78 n. 12 (1st Cir. 2005); Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003).

factor in the employer's decision, the burden of persuasion (and not just the burden of production as in <u>McDonnell Douglas</u>) shifts to the employer to show that the decision would have been the same without the discriminatory animus.  <u>See</u> 42 U.S.C. § 2000e-5(g)(2)(B).

In the instant case, the plaintiff alleges that BWH's "actions and inactions with regard to [her] complaints of disparate treatment and unequal pay on the basis of her color, gender and national origin" constitute discrimination.  <u>See</u> Plaintiff's Complaint, Count I, ¶ 87.  Paring down this allegation, Dr. Tuli essentially alleges that her gender and/or national origin were motivating factors in BWH's failure to respond appropriately to her requests for equal compensation and treatment.  The thousands of pages of documents and numerous depositions and affidavits in this case have not produced any direct evidence demonstrating that BWH failed to respond appropriately to Dr. Tuli's complaints about promotion or compensation; much less that the Hospital's response to her complaints was based on a discriminatory animus.  However, even if this Court believes that gender or national origin was a motivating factor in BWH's employment decisions, the evidence clearly establishes that BWH's decisions with respect to Dr. Tuli's compensation and promotion would have been the same, even without this motivating factor. Indeed, there is little in the way of circumstantial evidence against BWH that any of the decision makers for the Department of Neurosurgery (Dr. Black and Dr. Whittemore) exhibited any signs of discriminatory animus.

### 1.    Neither race nor gender was a motivating factor in BWH's employment decisions.

At issue in plaintiff's mixed-motive claim against BWH is **not** whether Dr. Arthur Day's interactions with Dr. Tuli were motivated by gender or national origin.  Rather, at issue with respect to this defendant is whether BWH responded appropriately and reasonably to Dr. Tuli's complaints about her treatment and compensation within the Neurosurgery Department and

whether the hospital's response was motivated by gender or national origin.

**a.      BWH took affirmative steps to respond reasonably to Dr. Tuli's requests regarding compensation and call schedule.**

It cannot reasonably be disputed that Dr. Day was ever, prior to the filing of this litigation, a relevant decision-maker with respect to Dr. Tuli's promotion and compensation. Dr. Day did not become the Chair of the Neurosurgery Department until July 1, 2007. Neither Dr. Tuli's compensation nor her status as an Assistant Professor has been reviewed since Dr. Day received this appointment. (See Exhibit B, ¶20). Thus, Dr. Day has not made any recommendations or taken any action as to Dr. Tuli's employment status at BWH. The evidence demonstrates that Dr. Day had no decision-making authority regarding Dr. Tuli's compensation or the decision whether or not to promote her prior to that time. Id.; Exhibit D, Deposition of Dr. Tuli, pp. 159-60. Given the above, the only remaining issue with respect to this defendant is whether the decision-makers at BWH were motivated by color or gender when making decisions concerning Dr. Tuli's employment.

As noted above, the records here clearly demonstrate that BWH took affirmative steps to resolve/address Dr. Tuli's complaints regarding her compensation and call schedule.

- ➤ In April 2005, BWH promoted Dr. Tuli to the position of Assistant Professor. (See Exhibit B, ¶6; Exhibit D, Deposition of Dr. Tuli pp. 89-91, 110-111);
- ➤ In an attempt to resolve the issues in the Department of Neurosurgery, the Hospital instituted a Department-wide review H.R. review in the Fall of 2005. (See Exhibit B, ¶ 9);
- ➤ In July of 2006, Dr. Black stepped down as Chair of the Department of Neurosurgery (See Exhibit B, ¶29).
- ➤ For the fiscal year of 2006, Dr. Tuli received a raise of ████, increasing her base salary to ████. (See Exhibit E, ¶5).
- ➤ In November 2006, Dr. Tuli was retroactively paid $5,000 per month in compensation for the additional spine call she had undertaken in 2005 and 2006, as a lump sum bonus of ████. (See Exhibit B, ¶34 & Exhibit E, ¶6). Dr. Tuli also received an additional payment of ████ at this time in bonus compensation, based on her productivity. (See Exhibit B, ¶35 & Exhibit E, ¶6). Dr. Tuli's total compensation from BWH for the Calendar Year of 2006 was ████. (See Exhibit E, ¶7).

➢ Dr. Tuli's base salary was also increased by ▮▮▮▮▮, elevating her base salary to ▮▮▮▮▮ in 2007 – the highest base salary of any Assistant Professor in the Department of Neurosurgery with her experience.  (See Exhibit B, ¶36 & Exhibit E, ¶¶8-10).

➢ In early 2007, Dr. Whittemore approved Dr. Tuli's request for a student research assistant to help her apply for an NIH K award/grant for research in spinal oncology.  Dr. Whittemore also sent e-mails to hospital faculty requesting assistance for Dr. Tuli's research.  (See Exhibit D, Deposition of Dr. Tuli pp.45-46, 50-52));

Clearly, in responding to plaintiff's complaints of discrimination, Dr. Whittemore was the decision-maker, as de-facto Chair of the Department of Neurosurgery.  The plaintiff does not assert, however, that her gender or national origin was a motivating factor in Dr. Whittemore's decisions regarding her compensation or call schedule.  In fact, neither in her Complaint nor at her deposition did Dr. Tuli indicate that she thought Dr. Whittemore discriminated against her.  (See Plaintiff's Complaint; Exhibit D).   Given the above, Dr. Tuli does not proffer any direct evidence to establish that her gender or national origin was a motivating factor in BWH's decision-makers' recommendations with respect to plaintiff's compensation or call schedule.

**b.  There is no evidence that BWH's decision not to promote Dr. Tuli to Director of Spine Division was motivated by her gender or color/national origin.**

None of the Chairs of the Neurosurgery Department promoted Dr. Tuli to the Director of Spine position.  Before Dr. Day was appointed as Chair of the Neurosurgery Department (July 2007) Dr. Tuli requested on numerous occasions to be named the Director of the Spine Division.  (See Exhibit D, Deposition of Dr. Tuli, Vol. 1, pp. 157-58).  The then Chairs of the Neurosurgery Department, Dr. Peter Black, not Dr. Day, declined to name Dr. Tuli as Director of Spine.  Id.  There is no evidence that this decision was motivated by Dr. Tuli's gender or national origin and Dr. Black is not a defendant in this action.  By the time Dr. Tuli asked Dr. Day to promote her to Director of Spine (after February 2007) the structural dynamics in the Neurosurgery Department had changed and there were no longer any divisions, as there had been during Dr. Black's tenure as Chair.  Given these facts, there is no evidence that plaintiff's gender or national origin were

ever contributing factors in BWH's decision not to name her Director of Spine.  To this day, there has been no Director of Spine at the BWH since Dr. Eric Woodard left in 2004.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

Where there has been no spine division at BWH since 2006, or thereafter, there is no evidence that any decision by the BWH after February 2007 not to name Dr. Tuli as "Director of Spine" (a position that has not existed since 2004) was motivated by discriminatory animus.

### 2.    BWH would not have treated Dr. Tuli differently in the absence of discrimination.

Even if this Court finds that BWH's employment decisions were motivated by Dr. Tuli's gender or national origin, summary judgment is appropriate on plaintiff's mixed motive discrimination claim because Dr. Tuli would not have been treated differently by the hospital even absent any alleged discriminatory animus. 42 U.S.C. § 2000e-5(g)(2)(B) establishes that the defendant may avoid liability if it can demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor."

Assuming *arguendo* that Dr. Day discriminated against Dr. Tuli based on her gender or national origin (which the defendant denies), Dr. Day had no control or authority over Dr. Tuli's compensation, promotions or call schedule prior to being named Chair in July 2007.  (See Exhibits B & C).  The plaintiff has not offered any evidence to the contrary to suggest that Dr. Day had any *de facto* control over Dr. Tuli's compensation or promotion.  . Therefore, there is no question that the defendant's employment decisions with respect to Dr. Tuli prior to July 1, 2007

would have been the same regardless of Dr. Day's discriminatory animus.

Moreover, there is also no evidence that Dr. Tuli's employment status would have changed after Dr. Day's appointment as Chair of the Neurosurgery Department. Since his appointment to Chair, Dr. Tuli's status for promotion or for increase in compensation has not been up for review. (See Exhibit C, ¶20). Where Dr. Day has not had the opportunity to impact Dr. Tuli's employment status at BWH, in his role as Chair, plaintiff cannot successfully argue/establish that her current title and compensation would have been different if a person other than Dr. Day were Chair of BWH's Neurosurgery Department. Therefore, as to claims against the Hospital in this regard, the defendant is entitled to summary judgment on the discrimination claim.

Furthermore, contrary to the plaintiff's assertions, her title and research status would not be any different without Dr. Day as Chair of the Neurosurgery Department.

### a.    Where there was no Spine Division at BWH, there was no need for a Director of Spine position.

Dr. Tuli asserts that after he was appointed Chair, she asked Dr. Day to be named the Director of Spine and that he declined this request. See Plaintiff's Complaint, ¶53. This claim is baseless. Regardless of whether Dr. Day was Chair in summer 2007, the plaintiff would not have been promoted to Director of Spine because there was no longer a "Spine Division" at the Hospital. (See Exhibit U, Deposition of Dr. Black, p. 119)

### b.    Dr. Tuli's research status would not be different if Dr. Day were not Chair of the Neurosurgery Department.

Dr. Tuli alleges in her Complaint that after Dr. Day was appointed Chair of the Department, he advised her not to perform any research, but offered such opportunities to male colleagues. See Plaintiff's Complaint, ¶ 19. This allegation has not been supported by the

evidence.   Dr. Tuli has acknowledged that she has never submitted a formal research proposal to anyone at BWH, including Dr. Day, and that her efforts to obtain outside funding, while supported by the BWH, have been turned down.. (See Exhibit D, Deposition of Dr. Tuli, pp. 27-28, 33-36, 39-45).  Plaintiff herself has acknowledged that she understands such a proposal to be a prerequisite to this process. (Exhibit D, p. 26)  Additionally, Dr. Tuli has testified that BWH has never denied any request for approval of her research by the Hospital's Institutional Review Board (IRB), another prerequisite to research.  Accordingly, the evidence demonstrates that, with or without Dr. Day as Chair, Dr. Tuli would currently be at the same stage in her research progress.

Given the above, the defendant has set forth ample evidence to prove that Dr. Tuli's position in the Neurosurgery Department at BWH would not be different without Dr. Day's alleged discrimination/bias.

## IV.    WHISTLEBLOWER STATUTE: DR. TULI CANNOT PROVE THAT DR. DAY RETALIATED AGAINST HER BECAUSE SHE REPORTED VIOLATIONS OF LAW OR VIOLATIONS OF PROFESSIONAL STANDARDS OF PRACTICE WHICH POSED A RISK TO PUBLIC HEALTH.

Massachusetts Gen. L.  c. 149, §187 provides a cause of action to health care providers who are retaliated against for disclosing problems within health care facilities.  See Romero v. UHS of Westwood Pembroke, Inc., 72 Mass.App.Ct. 539, 540 (2008).  §187(b) prohibits health care facilities from "refus[ing] to hire, terminat[ing] a contractual agreement with or tak[ing] any retaliatory action against a health care provider" for engaging in protected acts. The plaintiff maintains similar evidentiary burdens in order to prove a causal link to show retaliation, except that the types of protected activities are specifically codified under the statute.  See M.G.L. c. 149, §187(b)(1)-(4).

The plaintiff's complaint suggests that the protected act performed by the plaintiff was

██████████████████████████████████████████████████████

████████████████████████████████████    (See Exhibit T, pp. 50-53).  This is

protected activity under §187(b)(1), which shields from retaliation a disclosure to a manager

regarding an "activity, policy or practice of the health care facility…that the health care provider

[Tuli] reasonably believes is in violation of a law or rule or regulation...which the health care

provider reasonably believes poses a risk to public health."  M.G.L. c. 149 §187(b)(1).

Dr. Tuli alleges that Dr. Day violated the statute by retaliating against her for

complaining about ████████████████████ through his presentation in October 2007

before the MSCC.  Similarly, the plaintiff claims that BWH effectively retaliated against Dr. Tuli

by "putting her privileges at risk based on the input of Dr. Day" in that setting.  See Plaintiff's

Complaint, ¶ 104.

In order to prove her prima facie case, the plaintiff must present evidence that the

MSCC's decision was in retaliation for ████████████████████.  There is no

evidence that Dr. Tuli's role either as the M&M or QARM departmental representative played

any direct role in the MSCC's recommendation.  Similarly, there is no evidence that the MSCC

directly retaliated due to ████████████████████████████████

████████████  ████████████████████████████████████

████████████████████████████████████████████

Moreover, as set forth above, ████████████████████████████

████████████████████████████████████████████████

(See Exhibit M.)[9]

As to claims involving alleged retaliation by Dr. Day, unlike the general retaliation

claims asserted by the plaintiff, to show a violation of M.G.L. c. 149 §187, the plaintiff must

specifically produce evidence that Dr. Day's animus was motivated by the specific protected activity alleged by the plaintiff (in this case, the report to Ms. Barnes in 2004.)  The plaintiff has not produced any evidence to suggest that Dr. Day's presentation in October 2007 was motivated by his knowledge of ██████████████████████████████

The time span between Dr. Tuli's protected activity and the claim of retaliation is too long to support an inference of causation for purposes of the whistleblower statute.  Where adverse employment actions follow close on the heels of protected activity, a causal relationship may be inferred.  See Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir.1988).  However, as the elapsed time between the two events becomes greater, the inference weakens and eventually collapses.  See Oliver v. Digital Equip. Corp., 846 F.2d at 110-111 (causation not shown where firing occurred more than two years after filing of charge); Mole v. University of Massachusetts, 442 Mass. 582, 595 (2004);  see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.1999); Figgous v. Allied/Bendix Corp., 906 F.2d 360, 362 (8th Cir.1990) (directing a verdict for employer where only evidence was that employee had been fired one to two years after employer learned of his discrimination complaint); Cooper v. North Olmsted, 795 F.2d 1265, 1267, 1272 (6th Cir.1986) (same; firing occurred four months after filing of charge).[10]

Dr. Tuli's protected activity - ██████████████████████████████████ ████████████ - occurred approximately **three years** prior to the October 2007 MSCC meeting.  Therefore, as a matter of law, the plaintiff cannot prove a causal nexus between the protected

---

[9] BWH also reasserts its arguments related to summary judgment on the retaliation claim, supra.

[10] The plaintiff may attempt to characterize as a protected activity (despite the inherent hearsay problems) Dr. Day's alleged knowledge of Dr. Soni's statement in her MCAD complaint that Dr. Tuli had supported her claim.  In addition to the patent unreliability of the evidentiary foundation, Dr. Tuli's unspecified "support" is not a protected activity under M.G.L. c. 149 §187.

activity and the alleged retaliation by Dr. Day (and BWH).    Therefore, the plaintiff's whistleblower claim must be dismissed.

## V.    RETALIATION: DR. TULI CANNOT PROVE THAT THE MSCC'S RECOMMENDATIONS WERE CAUSALLY CONNECTED TO HER FILING COMPLAINTS AGAINST DR. DAY.

Dr. Tuli has not established evidence sufficient to prove her claim of retaliation.  In order to establish her prima facie case, a plaintiff must prove (1) that she engaged in protected conduct under Title VII; (2) that she suffered an adverse employment action; and (3) that the adverse action is causally connected to the protected activity.  See Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003); see also Mole v. University of Massachusetts, 442 Mass. 582, 591-92 (2004) (stating virtually identical to Massachusetts standard).    "It does not matter for retaliation purposes whether [defendant] would have treated [a similarly situated male] the same way he treated [plaintiff].  The relevant question is whether [defendant] was retaliating against [plaintiff] for filing a complaint, not whether he was motivated by gender bias at the time."  Burlington N. & Santa Fe Ry. Co. v. While, 548 U.S. 53, 63 (2006).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████  See Plaintiff's Complaint, ¶¶ 54-76.  Thus, at issue here, is whether there is a causal connection between Dr. Tuli's Category level and/or academic position after Dr. Day's presentation before the re-credentialing Committee and the filing of her complaints against Dr. Day.  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████  ███████████████████

████████████████████████████████████████████████████████████

██████████████████████████

**A.**    **The Defendant Did Not Retaliate Against Dr. Tuli because the MSCC Independently Assigned a Category 2 Designation Prior to Any Input by Dr. Day.**

On August 28, 2007, Mary Beth Mann, the Credentialing Administrator for BWH Provider Services wrote a letter to Dr. Day, stating in part that, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

See Exhibit K.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████. See Exhibit N.

Furthermore, there is an e-mail by Joanne Hastings to Dr. Whittemore on September 21, 2007, ████████████████████████████ Ms. Hastings notes that ████

████████████████████████████████████████████

████████████████ In the e-mail, Ms. Hastings characterizes ████████████████

████████████████████████████████████ See Exhibit M. Ms. Hastings further suggested to Dr. Whittemore that Dr. Tuli could likely be

████████████████████████████████████████████

████████████████████████████ Ms. Hastings further noted that █████████████████████████████████████████

██████████████████ Id. This is direct evidence that, before any involvement by Dr. Day (and despite any later interactions), there was already a distinct non-discriminatory and non-retaliatory motive to ████████████████. The plaintiff has not, and could not, make any case

that either Mary Beth Mann or Joanne Hastings had any discriminatory or retaliatory intent in

████████████████████████████████████████████████████████████████████████████████

██████ .

**B.    The MSCC's Independent Evaluation of Dr. Tuli's Case Broke the Causal Connection Between Dr. Day's Alleged Retaliatory Animus and The Committee's Recommendation.**

Ultimately, there is no causal connection between Dr. Day's presentation, whether biased or not, and the MSCC's ultimate credentialing decision as to Dr. Tuli.[11]    A third person's independent decision to take adverse action breaks the causal connection between a supervisor's retaliatory or discriminatory animus and the adverse action, for purposes of retaliation claims under Title VII and Massachusetts antidiscrimination statue.  Civil Rights Act of 1964, § 704, 42 U.S.C.A. § 2000e-3; M.G.L.A. c. 151B, § 4, subd. 4.  The involvement of a third person as the actual decision maker will not break the causal connection if that decision maker merely "rubber stamps" the recommendation of the retaliating supervisor, or if the retaliating supervisor "dupes" the decision maker into taking action, or otherwise controls the decision maker.  Cariglia v. Hertz Equip. Rental Corp., 363 F.3f 77, 87 & n.4 (1st Cir. 2004).  However, the mere fact that a retaliating supervisor provides some of the information on which a decision is based, or initially recommends the adverse employment action to someone higher up in the organization, does not necessarily mean that the decision maker lacks sufficient independence from the supervisor for these purposes.  Mole v. University of Massachusetts, 442 Mass. 582, 589 (2004) citing Willis v. Marion County Auditor's Office, 118 F.3d 542, 547-48 (7th Cir. 1997); see also Thompson v. Coca-Cola, Co., 522 F.3d 168, 178 (1st Cir. 2008).

The referral to an independent fact finder, i.e., Dr. Whittemore, is exactly the course of

---

[11] Regardless of whether Dr. Day's alleged motivation is also based on alleged discriminatory motives, the same defense regarding the sufficiency of the MSCC further investigation applies, as set out herein.

action advocated by the court in response to situations where there has been an appearance of impropriety in the underlying personnel recommendation. See Thompson v. Coca-Cola, Inc, 522 F.3d 168 (1st Cir. 2008); Mole v. Univ. of Mass, 442 Mass. 582, 814 N.E.2d 329 (2004). Indeed, at the May 21, 2008 hearing, this Court suggested that she might consider an order that the Committee to reconvene and reconsider Dr. Tuli's credentialing in light of the facts. As set out herein, the Committee clearly has already undertaken that step and it believes that the process was fair and accurate, particularly in light of the presentation by Dr. Whittemore (See Exhibit R, Affidavit of Dr. Coblyn).

It is the plaintiff's burden of proof to show that the process was irrevocably tainted by the alleged misrepresentations by Dr. Day. However, the plaintiff utterly fails to show that Dr. Day's statements were false or biased or were based on a discriminatory or retaliatory animus. More importantly, the plaintiff has produced no evidence that ████████████████████████ ██████████████████████████████████████ As the Magistrate noted in his report, the plaintiff simply has not sustained her burden to show that the committee acted improperly in ████████████████████████.

Thompson, quoting Mole, held that, "Despite a retaliatory or discriminatory motive on the part of a supervisor who recommends that some adverse action be taken against an employee, a third person's independent decision to take adverse action breaks the causal connection between the supervisor's retaliatory or discriminatory animus and the adverse action." See Thompson v. Coca-Cola, Inc., 522 F.3d 168, 178 (1st Cir. 2008), quoting Mole, 814 N.E.2d at 343. In Thompson, the committee charged with reviewing the plaintiff's performance made its own independent decision to terminate the plaintiff. The plaintiff's consideration for review came about as the result of his failure to properly follow company rules. This closely parallels

the process that brought Dr. Tuli up for renewal as a ███████████████████████████████ ████████ .

Thompson held that, "If there is no proof of discriminatory animus on the part of a decisionmaker, a plaintiff must show more than that the decisionmaker's perception was incorrect; he must show that the "decisionmaker did not believe in the accuracy" of the information that he was given. [Citation omitted].   Put another way, "[t]he question is not whether [Thompson's] or his fellow employees' version is the true one, but whether [the decisionmakers] believed what [they] had been told by those [who were] interviewed" by management."  See Thompson, 522 F.3d at 178, quoting Ronda Pérez v. Banco Bilbao Vizcaya Argentaria Puerto Rico, 404 F.3d 42, 45 (1st Cir.2005).

The evidence presented as to the December 2007 committee meeting only supports a finding that, █████████████████████████████████████████████████████ ████████████████████████████████████████████████ .

████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████ .  (See Exhibit Q).   As the notes indicate, Dr. Whittemore ██████████████████████████████████████████████ ████████████████████████████████████████ Dr. Jonathan Coblyn, the committee chair, ██████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████

Dr. Coblyn also attested that, after Dr. Whittemore's presentation, ███████████████████

████████████████████████████████████████████ (See Exhibit R, Affidavit of

Dr. Coblyn, ¶14).  He further attested that:



See Exhibit R, ¶¶21-23.

There is no evidence that would suggest in any way that Dr. Coblyn has any reason to retaliate against Dr. Tuli, or that his motives, or those of the MSCC, were discriminatory in any way.  Additionally, and significantly, as Dr. Coblyn's Affidavit makes clear, even now, with full knowledge of Dr. Tuli's complaints against Dr. Day, Dr. Coblyn still believes, █████████████ ████████████████████████████████  In that regard, Dr. Coblyn also confirmed that the ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ (See Exhibit R, ¶15).  Other committee members have also testified that, as a result of Dr. Whittemore's testimony, the process was fair and ███████████████ ████████████ (See Exhibit T, Deposition of Janet Barnes, p. 169).

This evidence clearly demonstrates that pursuant to Thompson, the decisionmakers on the committee believed (and still believe, even now, with full knowledge of Dr. Tuli's allegations) that their action was correct.  Significantly, ██████████████████████████████████ ████████████████████████ the plaintiff has not presented any evidence that would

support a finding that the credentialing process undertaken subsequent to Dr. Day's participation was unfair in any way.

The plaintiff also had an opportunity to meaningfully address the patient complaints and her other concerns both before and after the October 2007 committee meeting. The defendants re-iterate their argument that the evidentiary record conclusively demonstrates that ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ Therefore, even at the heightened standard advocated by <u>Thompson</u>, the plaintiff's claim that the process was irretrievably tainted must fail.

**C.    <u>The Recommendation that Dr. Tuli Undergo a PHS Evaluation Is Not an Adverse Employment Action.</u>**

Summary judgment is appropriate on plaintiff's retaliation claim against BWH because Dr. Tuli never suffered an adverse employment action as a result of Dr. Day's alleged retaliatory comments. The MSCC's recommendation ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Other than Dr. Tuli's own self-serving statements, there is no evidence that her position in the Neurosurgery Department would be negatively impacted by the ██████████████████████████████. To the contrary, per Dr. Coblyn, the head of the MSCC, a

████████████████████████████████████████████████████████

███████████████████████████████ (<u>See</u> Exhibit R, ¶¶ 17-18). ██████████████████

████████████████████████████████████████████████ (<u>See</u> Exhibit R, ¶¶ 17-18). Dr. Tuli does not present evidence that her position at BWH would be negatively

impacted by the ███████████████████, especially where this recommendation is confidential and would permit her to continue working the same capacity she had for the prior five years.

Where ███████████████ has had no adverse impact on Dr. Tuli's position or her practice in the Neurosurgery Department at BWH, there is simply no evidence that Dr. Tuli's employment was adversely impacted by the MSCC's decision.

## **CONCLUSION**

For all of the foregoing reasons, the defendant, Brigham & Women's Hospital, respectfully requests that this Honorable Court enter summary judgment, in its favor, on the plaintiff's claims in this matter.

Respectfully submitted,

**Brigham & Women's Hospital, Inc.,**

By its attorneys,

/s/ Robert R. Hamel, Jr.
Robert R. Hamel, Jr., BBO: #567194
Matthew Grygorcewicz, BBO: #655771
Lisa R. Wichter, BBO: #661006
Melick, Porter & Shea, LLP
28 State Street, 22nd Floor
Boston, Massachusetts 02109
Telephone:  (617) 523-6200
rhamel@melicklaw.com

Dated:  December 5, 2008

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by hand-delivery on December 5, 2008.

/s/  Matthew Grygorcewicz
Counsel for defendant, Brigham and Women's Hospital